UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORTHOPAEDIC HOSPITAL d/b/a Orthopaedic Institute For Children,<br><br>                                    Plaintiff,<br><br>v.<br><br>DJO GLOBAL, INC. and DJO FINANCE LLC,<br><br>                                    Defendants. | Case No.: 19-CV-970 JLS (WVG)<br><br>**ORDER ON CLAIM CONSTRUCTION** |

Presently before the Court are Plaintiff Orthopaedic Hospital's ("Pl.'s Br.," ECF No. 50) and Defendants DJO Global, Inc. and DJO Finance LLC's ("Defs.' Br.," ECF No. 49) Opening Claim Construction Briefs, as well as each Party's response to the other's Opening Brief ("Pl.'s Resp.," ECF No. 61; "Defs.' Resp.," ECF No. 62). The Parties dispute the meaning of four claim terms in five related U.S. Patents: U.S. Patent Nos. 8,796,347 (the "'347 patent"), 8,658,710 (the "'710 patent"), 9,155,817 (the "'817 patent"), 9,242,025 (the "'025 patent"), and 9,302,028 (the "'028 patent") (collectively, the "Asserted Patents"). The Court heard oral argument, including tutorials from the Parties, on June 11, 2020. *See* ECF No. 69. Having carefully considered the Parties' arguments, the evidence, and the law, the Court rules as follows.

**LEGAL STANDARD**

"A determination of infringement involves a two-step analysis. 'First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process.'" *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1320 (Fed. Cir. 2003) (citing *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993)).

The first step, commonly known as claim construction, is presently before the Court. Claim construction is a matter of law for the Court's determination. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388 (1996) ("[J]udges, not juries, are the better suited to find the acquired meaning of patent terms.").

Words of a claim are "generally given their ordinary and customary meaning." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). Because the inquiry into the meaning of claim terms is an objective one, "a court looks to those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004). "Those sources include the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."[1] *Id.* (citing, *inter alia*, *Vitronics*, 90 F.3d at 1582–83).

Claim construction begins with an analysis of the words of the claims themselves. *See Scanner Techs. Corp. v. ICOS Vision Sys. Corp.*, 365 F.3d 1299, 1303 (Fed. Cir. 2004)

---

[1] The first three sources are considered "intrinsic evidence" of claim meaning. *See generally Phillips*, 415 F.3d at 1314–17.

(holding that claim construction "begins and ends" with claim's actual words).  "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314.  The meaning of a claim term, however, as understood by ordinarily skilled artisans often is not immediately apparent.  *Id.*  In those situations, the court looks to "sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean."  *Id.*  Or, when a patentee "chooses to be his own lexicographer and use terms in a manner other than their ordinary meaning," the court can use the patentee's meaning "as long as the special definition of the term is clearly stated in the patent specification or file history." *Vitronics*, 90 F.3d at 1582.

In examining the claims themselves, "the context in which a term is used can be highly instructive." *Phillips*, 415 F.3d at 1314.  Moreover, "[o]ther claims of the patent in question, both asserted and unasserted[,] can . . . be valuable sources of enlightenment as to the meaning of a claim term."  *Id.* (citing *Vitronics*, 90 F.3d at 1582).  "Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims."  *Id.*  Conversely, under the doctrine of claim differentiation, "'different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope.'"  *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1369 (Fed. Cir. 2007) (quoting *Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971–72 (Fed. Cir. 1999)).

"Importantly, the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Phillips*, 415 F.3d at 1313.  "The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines them by implication."  *Vitronics*, 90 F.3d at 1582.  "In addition to providing contemporaneous technological context for defining claim terms, the patent applicant may also define a claim term in the specification 'in a manner inconsistent with

its ordinary meaning.'" *Metabolite Labs., Inc. v. Lab. Corp. of Am.*, 370 F.3d 1354, 1360 (Fed. Cir. 2004). "Usually, [the specification] is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582; *accord Phillips*, 415 F.3d at 1317 ("It is . . . entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of the claims.").

Patent claims should ordinarily be construed to encompass the preferred embodiments described in the specification, for "[a] claim construction that excludes a preferred embodiment . . . 'is rarely, if ever, correct.'" *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1285 (Fed. Cir. 2005) (quoting *Vitronics*, 90 F.3d at 1583). A court should not, however, import limitations from the specification into the claims, *Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."), absent a specific reference in the claims themselves, *Reinshaw PLC v. Marposs Societa' ex rel. Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("[A] party wishing to use statements in the written description to confine or otherwise affect a patent's scope must, at the very least, point to a term or terms in the claim with which to draw in those statements.").

The patent's prosecution history, if in evidence, may also shed light on claim construction. *Vitronics*, 90 F.3d at 1582. "This history contains the complete record of all proceedings before the Patent and Trademark Office [("PTO")], including any express representations made by the applicant regarding scope of the claims." *Id.* "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. Although the prosecution history "often lacks the clarity of the specification," it is nevertheless useful to show "how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

"In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on

extrinsic evidence." *Vitronics*, 90 F.3d at 1583. Thus, expert testimony on the proper construction of disputed claim terms "may only be relied upon if the patent documents, taken as a whole, are insufficient to enable the court to construe disputed claim terms." *Id.* at 1585. But, *Vitronics* does not state a rule of admissibility, nor does it "prohibit courts from examining extrinsic evidence, even where the patent document is itself clear." *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999). As the Federal Circuit has made clear:

> because extrinsic evidence can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean, it is permissible for the district court in its sound discretion to admit and use such evidence.

*Phillips*, 415 F.3d at 1319; *accord Key Pharms. v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998) ("[T]rial courts generally can hear expert testimony for background and education on the technology implicated by the presented claim construction issues, and trial courts have broad discretion in this regard."). The court is not "barred from considering any particular sources or required to analyze sources in any specific sequence, as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *Phillips*, 415 F.3d at 1324 (emphasis added); *see also Biagro W. Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296, 1302 (Fed. Cir. 2005) ("Extrinsic evidence, such as expert testimony, may be useful in claim construction, but it should be considered in the context of the intrinsic evidence.").

## ANALYSIS

## I.     The Asserted Patents

Each of the Asserted Patents in suit is entitled "Oxidation-Resistant and Wear-Resistant Polyethylenes for Human Joint Replacements and Methods for Making Them." The Asserted Patents are generally directed to methods for making the polyethylene orthopedic implants that exhibit less wear, allowing them to be used actively over many

///

19-CV-970 JLS (WVG)

years.   Reducing wear allows younger patients to use the implants with fewer complications and less need for follow-up surgeries.

Many implants, including the present invention, are made of a polyethylene called "ultra-high molecular weight polyethylene" ("UHMWPE"), which is a material that generally is less prone to wear.  A conventional way to make the implants is to form the implant from UHMWPE; package the implant; and sterilize the implant with radiation, gas plasma, or ethylene oxide.

A general theme of the prior art is the desire to improve wear-resistance in UHMWPE implants.  One way to improve wear-resistance is to use radiation to induce "crosslinking," which is the formation of a chemically bonded network out of the individual chains of polyethylene, in the UHMWPE.   While irradiation-induced crosslinking can improve wear-resistance of the UHMWPE, it also increases the number of free radicals in the implant, which leads to oxidation.  Over time, oxidation can cause pitting, delamination, and fracture.  One response was to not use radiation at all and instead to use other means to sterilize implants.

To reduce the problems with oxidation while still gaining the benefits from crosslinking, some prior art taught using "thermal treatments."  After dosing the implant with radiation, the UHMWPE would be annealed (heating just below the melt temperature) or remelted (heating above the melt temperature) to reduce free radicals and thus minimize oxidation.   But thermal treatments can disrupt the microscopic organization of polyethylene chains, weakening the implant.  Using thermal treatments also precludes the use of direct molded implants because the remelting of the polyethylene can cause distortion.

The present invention sought to improve these methods to create an even more wear-resistant implant, without the downsides.  The Asserted Patents teach using higher levels of radiation to highly crosslink the UHMWPE.  To avoid the problems caused by heating the implant, the Asserted Patents teach removing the tradition thermal treatment step.  And to reduce oxidation, they teach adding an antioxidant into the UHMWPE.

## II.     Disputed Terms

### 1.     *"sterilizing"*

The term "sterilizing" appears in claim 1 of the '025 patent.  Plaintiff would construe the term according to its plain and ordinary meaning: "killing microorganisms in or on."  Pl.'s Br. at 16.  Defendants argue the Court must limit the term to "irradiating with gamma ray electron beam radiation to kill bacteria or other microorganism."  Defs.' Br. at 12.

The Parties agree that the plain and ordinary meaning of "sterilizing" is "killing microorganisms in or on."  *See* Defs.' Br. at 12; Pl.s' Br. at  16; Defs.' Resp. at 4.  Defendants contend that the Court must construe the term more narrowly, however, arguing that language used by the inventors in the specification, as well as statements to distinguish prior art during the prosecution history, compel limiting "sterilizing" in the claims to sterilization using gamma ray and electron beam radiation.  *Id.*

The Court begins its analysis with the language of claim 1 of the '025 patent:

> A method for producing a wear-resistant and oxidation resistant medical implant for a joint prosthesis comprising:
>
> > providing an oxidation-resistant orthopaedic material comprising a polyethylene;
> >
> > forming the orthopaedic material into an implant for the joint prosthesis;
> >
> > packaging the orthopaedic material after being formed into the implant;
> >
> > sterilizing the orthopaedic material while packaged; and
> >
> > irradiating the orthopaedic material during the method at a total radiation dose of above 5 Mrad to about 25 Mrad so as to crosslink the orthopaedic material, thereby improving its wear resistance, without thermally treating the orthopaedic material to extinguish free radicals in the orthopaedic material during or subsequent to irradiating the orthopaedic material, wherein the orthopaedic material

> contains an antioxidant rendering it resistant to oxidation
> caused by free radicals generated by the irradiation.

'025 patent, 16:40–58.

Defendants make no arguments that the claims limit the scope of sterilizing to methods of radiation only. *See generally* Defs.' Br.  Plaintiff points to dependent claim 15, arguing that it requires independent claim 1 be broad enough to encompass methods of sterilization other than irradiation.  Pl.'s Resp. at 2.  Claim 15 of the '025 patent describes: "The method of claim 1 wherein all of the radiation dose is delivered before the orthopaedic material is formed into an implant."  '025 patent, 18:15–18.  Independent claim 1, however, requires the implant to be formed before it is packaged, and for sterilization to occur "while packaged."  '025 patent, 16:44–48.  Because claim 15 requires all radiation doses to occur before the orthopaedic material is formed into an implant, sterilization must be done by some means other than irradiation.  As Plaintiff notes, this means "the sterilizing step of claim 1 must be understood broadly enough to encompass non-irradiation methods of sterilization."  Pl.'s Resp. at 3 (citing *Phillips*, 415 F.3d at 1324–25).  Thus, the claim language indicates that the plain and ordinary meaning is appropriate.

Defendants, however, contend that the specification and prosecution history narrowed the claim's scope to sterilization using only gamma ray or electron beam radiation.  "[A] party wishing to alter the meaning of a clear claim term must overcome the presumption that the ordinary and accustomed meaning is the proper one, demonstrating why such an alteration is required."  *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1362–63 (Fed. Cir. 1999).  Here, the Court finds Defendants have failed to demonstrate the patentee disavowed the full scope of the claim in either the specification or the prosecution history. In each of Defendants' examples of a disavowal from the specification and prosecution history, the language does not restrict the invention to using irradiation sterilization.

First, Defendants argue that the patentee disavowed other sterilization methods in the following passage:

/ / /

1
2
3
4
5
6
7

> [T]he present invention also has the advantage of allowing for the use of gamma or electron beam to sterilize the component, rather than gas plasma or ethylene oxide that are currently used to avoid the free radicals generated by irradiation sterilization. The ability to use irradiation sterilization is an added advantage since gas plasma or ethylene oxide may not be appropriate for some modular types of implants because of the low penetration of gas plasma or ethylene oxide into the interfaces between the components of the implant.

8
9
10
11
12
13
14

'025 patent, 7:42–52.   Defendants contend that, because the patentee identified a "particular process of the 'present invention,'" the Court is required to limit the claims to the identified process.  Defs.' Br. at 13 (citing *Pacing Techs., LLC v. Garmin Int'l, Inc.*, 778 F.3d 1021, 1025 (Fed. Cir. 2015)).  But this passage, contained in a section describing why "the present invention is . . . easier and cheaper to carry out than the conventional methods," '025 patent, 7:29–30, "seems unlikely" to have been intended to limit all of the claims of the invention to these processes.  *Pacing*, 778 F.3d at 1025.

15
16
17
18
19
20
21
22
23
24
25
26
27

In *Pacing*, the Federal Circuit noted that "[m]any times, the patent drafter will cast certain features as 'an object of the present invention,'" but that such language "will not always rise to the level of disclaimer."  *Id.*  There, the court found a disclaimer because the patentee included "additional language that constitute[d an] unmistakable disclaimer when considered in the context of the patent as a whole."  *Id.*  "Immediately following the enumeration of the objects of the present invention," the patentee stated that "those listed 19 objects and other objects and features of the present invention are accomplished, as embodied and fully described herein, by a repetitive motion pacing system."  *Id.* (alterations omitted).  That language did not "describe yet another object of the invention— [it] alert[ed] the reader that the invention accomplishe[d] all of its objects and features (the enumerated 19 and all others) with a repetitive motion pacing system."  *Id.*  The court found that for the patent in question, the language "clearly and unmistakably limit[ed] 'the present invention' to a repetitive motion pacing system."  *Id.*

28

///

9

Here, there has been no such "unmistakable disclaimer." *See id.* The specification states that "the present invention also has the advantage of *allowing* for the use of gamma or electron beam to sterilize the component." By using the term "allowing for," the statement is permissive, rather than restrictive. *See* Pl.'s Resp. at 4 (citing *Nellcore Puritan Bennet, Inc. v. Portex, Inc.*, No. C 04-1934 VRW, 2005 WL 6218588, at *6 (N.D. Cal. May 21 2005) ("'Allowing' is a permissive term[.]")). The passage also states the invention allows for the "ability to use" irradiation, another example of permissive language. Far from clearly and unmistakably limiting the present invention to sterilization by irradiation, the passage merely permits it.

Another example in the specification Defendants point to is the patentee's statement that

> the present invention has the advantage of allowing for the use of gamma or electron beam to sterilize the component, rather than gas plasma or ethylene oxide that are currently used. The ability to use irradiation sterilization is an added advantage since gas plasma or ethylene oxide may not be appropriate for some modular types of implants.

'025 patent, 7:42–52. This passage does not clearly disavow other types of sterilization techniques. Like the analysis above, the use of permissive language, including "allowing for," "ability to use," and "may," does not restrict the invention to irradiation sterilization or disavow other methods. The sentence states only that other methods "may" not be appropriate for "some modular types of implants," which is not a clear indication that they would be inappropriate in all circumstances for all implants.

Defendants also contend the patentee disavowed other types of sterilization during the prosecution of the '025 patent. For example, Defendants argue that when the patentee distinguished the present invention from prior art references Merril (U.S. Patent No. 6,786,933) and McNulty (U.S. Patent No. 6,692,679), the patentee disavowed other methods of sterilization by stating that, in contrast to those references, "the present invention allows for a one-step irradiation sterilization and crosslinking of the implant."

Zisser Decl. Ex. 4 at 1737–38, ECF No. 49-2.  And in contrasting the present invention from prior art reference Tomita (Japanese Patent Application JP 11-239611), Defendants point out the patentee's statement that, unlike the present invention, "Tomita teaches that sterilization-radiation can be avoided by using alternative, non-radiation methods, such as dry heat or gas sterilization." *Id.* Ex. 6.

To show a prosecution disclaimer, Defendants must show "the alleged disavowing actions or statements made during prosecution [were] both clear and unmistakable." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325–26 (Fed. Cir. 2003).  Here, there is no clear and unmistakable statements or actions disavowing non-irradiation sterilization methods.  As with the specification, the language used to distinguish McNulty and Merril is permissive, rather than restrictive.  And in distinguishing Tomita, the patentee did not disparage the other methods of sterilization; rather, the patentee showed why allowing the use of radiation in high doses to increase crosslinking is preferable to avoiding radiation altogether.  *See Omega Eng'g*, 334 F.3d at 1325 ("To balance the importance of public notice and the right of patentees to seek broad patent coverage, we have thus consistently rejected prosecution statements too vague or ambiguous to qualify as a disavowal of claim scope.").  "Stated otherwise, the patentee did not deliberately and unambiguously define its invention" as one that does not use non-radiation sterilization methods. *See id.* at 1326. Instead, the patentee made clear what the invention's crucial features are: using higher doses of radiation for crosslinking and removing the need for thermal treatments.  *See Omega Eng'g*, 334 F.3d at 1326.

In conclusion, the Court adopts the plain and ordinary meaning of "sterilization" as proposed by Plaintiff.

### 2.    *"medical implant"*

The term "medical implant" appears in: the '347 patent, claims 1, 8, and 12 through 16; the '710 patent, claims 1, 8, and 12 through 16; the '817 patent, claims 1 and 10 through 15; the '025 patent, claim 1; and the '028 patent, claims 1, 7, 8, 13, 14, and 18.  Plaintiff would construe the term as "component(s) manufactured for implantation in a patient's

body." Pl.'s Br. at 18.  Defendants would construe the term as "a component that has been direct molded or machined into its final shape for implantation into a patient's body."[2] Defs.' Br. at 16.  The Parties agree that Plaintiff's construction is the the plain and ordinary meaning of the term.  *See* Pl.'s Resp. at 7.  Defendants contend that the term must be narrowed to a finished product that has been direct molded or machined into its final shape. Defs.' Br. at 17.

Defendants contend that the claims, specification, and prosecution history all support their construction.  Turning first to the specification, Defendants point to the following passage as an example of the inventor limiting the term to direct molding or machining: "the present invention provides for a wear resistant and oxidation resistant implant by fabricating the implant from an oxidation-resistant polyethylene, including either shaping (such as machining) it form a performed polyethylene, or by direct molding."  Defs.' Br. at 18–19 (citing '347 patent, 7:1–6).  Defendants contend that because the inventor describes only machining and direct molding as features of "the present invention," the scope of the claim term must be so limited.  *Id.*  Although this passage begins with "the present invention," which is a phrase that can limit the scope of an invention to the ensuing description, *see  Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013), the description here includes permissive language that does not show a clear intent to limit the claim to only direct molding or machining.  The use of the terms "including" and "such as" when describing the fabrication methods indicates other methods are possible.  And although the only two methods discussed in the Asserted Patents are direct molding and machining, that is not enough to limit the term to those embodiments, absent clear language indicating the patentee intended to do so.  *See Phillips*, 415 F.3d at 1323 ("[W]e have expressly rejected the contention that if a patent describes only a single

---

[2] At the June 11, 2020 hearing, Defendants offered an alternative construction to this term.  Defendants said they would accept modifying their proposal to state: "a component that has been direct molded or shaped such that it is discernable as the intended finished component for implantation into a patient's body."  Because the Court finds no reason to deviate from the plain and ordinary meaning, the Court rejects this proposal as well.

embodiment, the claims of the patent must be construed as being limited to that embodiment.").

Regarding whether the term is limited to finished articles in their final shape, neither the specification nor the prosecution history shows the patentee engaged in lexicography or clearly and unmistakably disavowed the term's full scope of its ordinary and customary meaning. For example, while Defendants point out language in the specification regarding "finished articles" and "finished implants," this does not support a finding that "medical implants" should be construed as "finished" as well. In fact, the presence of the modifier "finished" before the term supports Plaintiff's position that the term by itself is not similarly modified. *See Phillips*, 415 F.3d at 1314 (noting that the use of the term "Steel Baffles" implies "baffles" are not necessarily made of steel).

Although not binding on this Court's decision, the claim construction of this term in *Depuy Orthopaedics, Inc. v. Orthopaedic Hospital*, No. 3:12-CV-299-CAN, 2016 WL 96164 (N.D. Ind. Jan. 8, 2016), is instructive as to whether it is limited to a finished product. In *Depuy*, an earlier suit involving the Asserted Patents, the Northern District of Indiana rejected a similar attempt to limit "medical implant" to a "finished article," finding that "the strength of support in both the intrinsic and extrinsic evidence for the plain and ordinary meaning of" medical implant favored the plain and ordinary meaning. *Id.* at *8. The court there held that "[t]he plain and ordinary meaning of [medical implant], as consistent with how a person of ordinary skill in the art would interpret the[] term[] at the time of the invention, will govern as required going forward." *Id.* Here, too, the Court finds Defendants have not overcome the presumption in favor of the ordinary meaning and have failed to show either lexicography or clear disavowal.

Next, Defendants turn to the claim language, arguing that several dependent claims "inform how the term should be construed." Defs.' Br. at 17. In support of their contention that the term refers to finished products, Defendants note that "three of the patents include dependent claims requiring that the 'medical implant' be placed in a package" and that "[t]wo of these patents include claims that . . . require that 'the oxidation-resistant implant

remains in the sealed package until the implant is to be implanted.'" *Id.* (citing '347 patent, claims 12–15; '710 patent, claims 12–15; '817 patent, claims 10–12).  To support their contention that the process for making the implant is restricted to direct molding or machining, Defendants note that claim 12 of both the '347 and '710 patents specifies that "the medical implant be made in one of two ways before it is packaged."  *Id.*

As Plaintiff correctly points out, however, independent claim 1 also includes the term "medical implant."  Pl.s' Resp. at 7.  Thus, under Defendants' construction, the dependent claims would limit the scope of independent claim 1.  This would be contrary to the general rule of claim differentiation, under which "'limitations stated in dependent claims are not to be read into the independent claim from which they depend.'"  *Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1370 (Fed. Cir. 2005) (quoting *Karlin Tech., Inc. v. Surgical Dynamics, Inc.*, 177 F.3d 968, 971–72 (Fed. Cir. 1999)).  Defendants argue that "claim differentiation is a rule of thumb that does not trump the clear import of the specification."  Defs.' Br. at 11 (quoting *Edwards Lifescis. LLC v. Cook Inc.*, 582 F.3d 1322, 1332 (Fed. Cir. 2009)).  But, as described above, the specification does not clearly limit the scope of this term and therefore does not overcome the general rule of claim differentiation.  *See Phillips*, 415 F.3d at 1316 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation is question is not present in the independent claim.").  Therefore, the claims do not support Defendants' construction.

Finally, Defendants contend that the patentees made several statements during the prosecution of the Asserted Patents that are "completely consistent with [their] understanding of a 'medical implant.'"  Defs.' Br. at 17.  But, as Plaintiffs note, Defendants do not "assert that any particular statement clearly and unmistakably disavowed claim scope."  Pl.'s Resp. at 9 (citing *Thorner*, 669 F.3d at 1364–65).  Because the Court finds the specification and claims do not support Defendants' construction, the prosecution statements offered by Defendants that are merely "consistent with" their understanding—
///

14

and not "clear and unmistakable" examples of disavowal—do not suffice to limit the scope of this claim. *See Omega Eng'g*, 334 F.3d at 1325–26.

In conclusion, the Court finds that the plain and ordinary meaning of "medical implant"—"component(s) manufactured for implantation in a patient's body"—is appropriate here.

### 3. *"degree of swelling" and "gel content"*

The term "degree of swelling" appears in claim 1 of the '710 patent; claims 2, 5, 7, and 8 of the '025 patent; and claims 2 and 8 of the '028 patent. Plaintiff would construe the term as the "weight ratio of swollen gel to dry gel." Pl.'s Br. at 24. Defendants argue the Court must construe the term as the

> weight ratio of swollen gel to dry gel as measured by the following process: Cut an approximately 1 MM thick sheet weighing about 0.4 gram out of the center of an irradiated specimen. Extract the sol-fraction in boiling p-exylene and allow to equilibrate at 120 deg C for 2 hours. Quickly transfer the swollen gel to a weighing bottle, cover and weigh. Then soak the sample in acetone and dry at 60° C. in a vacuum oven to constant weight. Using the average of five measurements, calculate the swell ratio as the weight of the swollen gel divided by that of the dried extracted gel.

Defs.' Br. at 22.

The term "gel content" appears in claim 1 of the '710 patent; claims 4, 6, 7, and 8 of the '025 patent; and claim 1 of the '028 patent. Plaintiff would construe the term as the "weight ratio of the gel to the overall composition." Pl.'s Br. at 23–24. Defendants argue the Court must construe the term as the

> weight ratio of gel to composition as measured by the following process: Cut an approximately 1 MM thick sheet weighing about 0.4 gram out of the center of an irradiated specimen. Extract the sol-fraction in boiling p-exylene for 72 hours, adding 0.5 wt% antioxidant (2.6-di-t-butyl-4-menthyl phenol) to prevent oxidation. After extraction, transfer the gel to fresh p-xylene and allow to equilibrate at 120 deg C for 2 hours. Quickly transfer the swollen gel to a weighing bottle, cover and weigh. Then soak

the sample in acetone and dry at 60° C. in a vacuum oven to constant weight.   Using the average of five measurements, calculate the swell ratio as the weight of the swollen gel divided by that of the dried extracted gel.

Defs.' Br. at 22–23.

As requested, the Court will analyze these two claims together "because they present the same issue: whether the terms should be construed to include the process by which they are measured." Defs.' Br. at 23.

The language Defendants use in their proposed constructions comes from Example 1 of the Asserted Patents, a preferred embodiment. *See, e.g.*, '347 patent, 15:39–59.  As the Federal Circuit has repeatedly held, "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).  Far from indicating that the embodiment limits the scope, however, the patentee explicitly stated that this embodiment was "not to be construed as limiting the scope of the invention." *See, e.g.*, '347 patent, 14:65–67.

Despite this admonition, Defendants request the Court limit the terms to this embodiment.  They contend that the Court "needs to determine what method is used to measure 'degree of swelling' and 'gel content' so that the parties will know what method must be used to test infringement." Defs.' Br. at 24.  Defendants point to several cases in which the Federal Circuit has held that, "[w]hen the method of measuring a claimed parameter affects the value of that parameter, the Court must decide what measurement is used by the claims." *Id.* (citing *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1354–55 (Fed. Cir. 2007); *Genetech, Inc. v. Wellcome Found. Ltd.*, 29 F.3d 1555, 1561–63 (Fed. Cir. 1994)).  Defendants point to results they produced regarding the degree of swelling of the accused products using a different method from the embodiment in the Asserted Patents, highlighting the need to assign a measurement process in this case.  *Id.* As the only method described in the Asserted Patents, Defendants argue the Court should

use the parameters in the embodiment.  Moreover, Defendants contend that without the parameters, the claims would be indefinite.  *Id.* at 24–25 & 24 n.4 (citing *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1345 (Fed. Cir. 2015); *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1340 (Fed. Cir. 2003)).

Plaintiff refutes the necessity of selecting a method or the specific parameters.  It contends that "the parties agree there are two primary ways of measuring 'degree of swelling' and 'gel content'": volumetric or weight-based approaches.  Pl.'s Resp. at 10. But Plaintiff asserts that only one method—the weight-based approach—"was known and used at the time of the invention."  *Id.*  The volumetric approach, which Plaintiff asserts is the process used by Defendants in support of their argument, was not available or widely used in the year 2000 (the earliest priority date of the Asserted Patents).  *Id.*  Indeed, Defendants note the volumetric method was not standardized until 2003.  Defs.' Br. at 23.

Here, the Court must agree with Plaintiff.  Defendants have not shown that there was more than one viable method to measure the "degree of swelling" and "gel content" at the time of the Asserted Patents' earliest priority date.  Without such a choice, a person or ordinary skill in the art would have been left with only one option: a weight-based approach.  Further, Defendants have not shown that the specific parameters of a weight-based test would affect the results.  The only evidence they have brought forward is from a volumetric test, which was not available at the earliest priority date of the Asserted Patents.

The cases relied on by Defendants do not support their contention that the claim would be indefinite.  As Plaintiff notes, *Osram*, *Teva*, *Honeywell*, and *Wellcome* each describe patents that failed to specify what method to use—in fields where multiple methods existed that produced varied results—not the specific parameters of the method. *See Teva*, 789 F.3d at 1345; *Osram*, 505 F.3d at 1354–55; *Honeywell*, 341 F.3d at 1340; *Wellcome*, 29 F.3d at 1562–63.  Here, by contrast, there was only one viable method that was widely known of at the time of the earliest Asserted Patent and there has been no ///

showing that different parameters of the weight-based method produce significantly different results. Thus, the Court need not specify the specific parameters.

For these reasons, the Court adopts Plaintiff's constructions of degree of swelling and gel content.

## CONCLUSIONS

The terms in dispute are construed as follows:

| TERM | CONSTRUCTION |
|---|---|
| **1. "sterilizing"** <br> (appears in: '025 patent, claim 1) | "killing microorganisms in or on" |
| **2. "medical implant"** <br> (appears in: '347 patent, claims 1, 8, 12–16, '710 patent, claims 1, 8, 12–16; '817 patent, claims 1, 10–15; '025 patent, claim 1; '028 patent, claims 1, 7, 8, 13, 14, 18) | "component(s) manufactured for implantation in a patient's body" |
| **3. "degree of swelling"** <br> (appears in: '710 patent, claim 1; '025 patent, claims 2, 5, 7, 8; '028 patent, claims 2, 8) | "weight ratio of swollen gel to dry gel" |
| **4. "gel content"** <br> (appears in: '710 patent, claim 1; '025 patent, claims 4, 6, 7, 8; '028 patent, claim 1) | "weight ratio of the gel to the overall composition" |

**IT IS SO ORDERED.**

Dated:  June 29, 2020

*Janis L. Sammartino*

Hon. Janis L. Sammartino
United States District Judge

18

19-CV-970 JLS (WVG)