UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORTHOPAEDIC HOSPITAL,<br><br>Plaintiff,<br><br>v.<br><br>ENCORE MEDICAL L.P.,<br><br>Defendant. | Case No.:  19-CV-970 JLS (AHG)<br><br>**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT AND DAUBERT MOTIONS**<br><br>(ECF Nos. 222, 225) |

Presently before the Court are Plaintiff Orthopaedic Hospital and Defendant Encore Medical L.P.'s Motions for Summary Judgment and *Daubert* Motions. (ECF Nos. 222 and 225). The Court heard oral argument on December 2, 2021, and the matter was thereafter taken under submission. Having considered the Parties' arguments, the evidence, and the law, the Court rules as follows.

## BACKGROUND

This is a patent infringement case in which Plaintiff asserts Defendant[1] infringes five of Plaintiff's United States Patents: U.S. Patents Nos. 8,796,347 ("the '347 Patent"),

---

[1] On March 3, 2021, the Parties entered into a stipulation allowing Orthopaedic Hospital to substitute Defendant Encore in place of original Defendants DJO Global, Inc. and DJO

8,658,710 ("the '710 Patent"), 9,155,817 ("the '817 Patent"), 9,242,025 ("the '025 Patent"), and 9,302,028 ("the '028 Patent") (collectively, "the Asserted Patents").  (ECF 165 ¶ 1).

Plaintiff moves for partial summary judgment of infringement and validity of two of the Asserted Patents: the '347 and '025 Patents.  (*See* ECF No. 221).  Defendant filed an Opposition (ECF No. 236), and Plaintiff filed a Reply (ECF No. 245).  Defendant filed a cross-motion for summary judgment of non-infringement and invalidity on all of the Asserted Patents.  (ECF No. 224).  Plaintiff filed an Opposition (ECF No. 233), and Defendant filed a Reply (ECF No. 248).

## I.    The Asserted Patents

Plaintiff "is an independent charitable organization that provides care for children with musculoskeletal disorders."  (ECF No. 165 ¶ 36).  Plaintiff asserts it has expended "considerable effort to advance the quality of materials used in the treatment of musculoskeletal disorders"—and the results of its research "culminated in the applications that yielded" the Asserted Patents.  *Id.* ¶¶ 39, 51.

The Asserted Patents are entitled "Oxidation-Resistant and Wear Resistant Polyethylenes for Human Joint Replacements and Methods for Making Them."  The named inventors are Harry McKellop and Fu-When Shen.  The Asserted Patents are collectively directed to methods for producing oxidation-resistant and wear-resistant polyethylene medical implants.  *See* '347 Patent at Abstract (ECF No. 1-4).  The polyethylene used is "preferably" "high molecular weight polyethylene" ("HMWPE") or "ultrahigh molecular weight polyethylene" ("UHMWPE").  *Id.* at col. 4:48–49.  The implants are "preferably" "components of prosthetic joints, *e.g.*, a bearing component of

///

///

Finance LLC.  (ECF No. 160 at 2).  The stipulation was approved by the Court on March 8, 2021.  (ECF No. 164 at 1–2).

an artificial hip or knee joint." *Id.* at Abstract.  The Asserted Patents all belong to the same patent family and share a common specification.[2]

As background, the Asserted Patents teach that UHMWPE is "commonly used" to make prosthetic joints. *Id.* at col. 1:29–31.  A known "conventional" method of making such implants is to form them out of UHMWPE, package, and then sterilize them with "radiation, gas plasma, or ethylene oxide." *Id.* at col. 1:29–36.  A general theme of the Asserted Patents is the desire to improve the wear-resistance of UHMWPE implants in order to extend their useful life and allow them to be used successfully in younger patients.  *Id.* at col. 1:46–52 ("[N]umerous modifications in physical properties of UHMWPE have been proposed to improve its wear resistance.").

As disclosed in the patent specifications, one prior art method of improving wear-resistance in prosthetic implants is irradiation sterilization to induce "crosslinking"—*i.e.*, the formation of a chemical bond between individual chains of polyethylene that links them together.  *Id.* at cols. 1:53–60; 6:29–30 ("[C]rosslinking of a polyethylene is known to improve the wear resistance in industrial implants.").  The Asserted Patents disclose that the industry standard dosage for such irradiation is between 2.5 to 4 Mrad and that a dosage of 3 to 3.5 Mrad is more typically used.  *Id.* at col. 1:60–62.  Irradiation-induced crosslinking in UHMWPE, however, produces unstable molecules known as free radicals.  *Id.* at 1:63–65.  In the presence of oxygen, the free radicals can cause oxidative degradation—which "has been associated with pitting, delamination, and fracture[.]" *Id.* at col. 1:66–2:2.

The prior art teaches methods of combating this oxidation effect, including: (1) packaging the implant either in an inert gas, in a partial vacuum, or with an oxygen scavenger during the irradiation process; (2) sterilizing the implant using gas plasma or

---

[2] All of the Asserted Patents originate from Application No. 10/258,762, filed in 2001, which claims priority to Provisional Application No. 60/200,525, which was filed in 2000.  This places the Asserted Patents before the effective date of the America Invents Act.

ethylene oxide, instead of radiation; (3) adding an antioxidant, such as Vitamin E, to the UHMWPE prior to irradiation; or (4) thermally treating the polyethylene either before or after irradiation crosslinking (*e.g.*, by annealing or remelting)[3] to extinguish residual free radicals. *Id.* at cols. 2:26–38; 3:35–60; 7:19–25.

The Asserted Patents teach a method of producing a wear-resistance and oxidation-resistant medical implant by subjecting an oxidation-resistant polymer material to a higher dose of radiation than that typically used in conventional sterilization, thereby increasing the level of crosslinking and improving wear resistance. *Id.* at col. 6:59–7:16. As the polyethylene used is "highly resistant to oxidation, despite the presence of free radicals," thermal treatment either during or after irradiation is unnecessary. *Id.* at col. 7:19–25.

## II.   The Asserted Claims

In this case, Plaintiff asserts that Defendant infringes: (1) independent claim 1 and dependent claims 2–6 of the '347 Patent; (2) independent claim 1 and dependent claims 2–14 of the '710 Patent; (3) independent claim 1 and dependent claims 2–3, 5, 10–12, and 14 of the '817 Patent; (4) independent claim 1 and dependent claims 2–13, 15 of the '025 Patent; and (5) independent claims 1, 8, and 14, and dependent claims 2–7, 9–13, and 15–18 of the '028 Patent. (ECF No. 224 at 6).

## III.   The Accused Products/Accused Methods

Defendant is a "medical device company that produces a variety of orthopedic products for rehabilitation, pain management and physical therapy." (ECF No. 165 ¶ 71). Plaintiff alleges Defendant infringes the Asserted Patents through Defendant's method of producing orthopedic implant products using Vitamin E blended polyethylene ("E+ polyethylene"). *Id.* ¶¶ 75–84.

---

[3] The process of remelting involves heating above the melting temperature of the polymer. In contrast, the process of annealing involves heating at below the melting temperature of the polymer.

According to Defendant, the material used to manufacture its E+ polyethylene products is produced using one of three material specifications. (ECF No. 224-5 at 10). The method is generally the same across all three specifications. First, a third-party, Orthoplastics, Ltd., obtains virgin UHMWPE resin that is pre-mixed with Vitamin E. *Id.* Orthoplastics uses compression molding to fabricate sheets of UHMWPE with Vitamin E, which are then cut into bars. *Id.* Orthoplastics then contracts with another third-party, Steris, to irradiate the bars at room temperature at a radiation dose specified in the material specification. *Id.* After further processing, involving shaping and trimming the raw material to various sizes, Orthoplastics delivers the finished polyethylene to Defendant or other vendors to be machined into finished medical implants. *Id.* at 10–11. The implants are cleaned, packaged, and sterilized, after which they are ready for final packaging, labeling, and distribution. *Id.* at 11. The Accused Products consist of products Defendant manufactures using the Accused Methods. (ECF No. 235-1 at 2).

## IV. Level of Skill in the Art

"[T]he level of ordinary skill in the art is a factual question that must be resolved and considered." *See Ryko Mfg. Co. v. Nu-Star, Inc.*, 950 F.2d 714, 718 (Fed. Cir. 1991). Here, Plaintiff proposes that the "relevant art" is "polymeric artificial orthopaedic implants." (ECF No. 51 at 18). Plaintiff further proposes a person of ordinary skill in the art at the time of invention is an individual who would have had either: "(1) a Bachelor's Degree in Chemical Engineering, Mechanical Engineering, Biomedical Engineering, Materials Science and Engineering, or another related field of science, *e.g.*, polymer science, as well as a number of years of related work experience in the field of polymeric artificial orthopaedic implants; or (2) an advanced degree in Chemical Engineering, Mechanical Engineering, Biomedical Engineering, Materials Science and Engineering, or another related field of science, *e.g.*, polymer science, as well as some related work experience in the field of polymeric artificial orthopaedic implants." *Id.*

Defendant proposes a person of ordinary skill in the art would have been an individual having a "Bachelor's Degree in Chemical Engineering, Mechanical

Engineering, Biomedical Engineering, Materials Science and Engineering, or another related field of science, *e.g.*, polymer science, as well as at least two years of related experience in the field of polymeric orthopaedic implant biomaterials." (ECF No. 49-4 at 5).

There is no significant difference between the Parties' definitions of the level of ordinary skill in the art. The Parties agree a person of ordinary skill in the art is an individual having *at least* a Bachelor's Degree in Chemical Engineering, Mechanical Engineering, Biomedical Engineering, Material Science and Engineering, or another related field of science. It is also uncontested a person of ordinary skill would have had industry experience. As these elements are largely agreed upon by the Parties, the Court adopts them for the purposes of this Order. (ECF No. 281 at 15:18–22; 22:6–16).

## V.   Claim Construction Order

On June 29, 2020, after holding a technology tutorial and claim construction hearing, the Court issued an order construing the following four terms:

| TERM | CONSTRUCTION |
|---|---|
| **"sterilizing"** (appears in: '025 Patent, claim 1) | "killing microorganisms in or on" |
| **"medical implant"** (appears in: '347 Patent, claims 1, 8, 12–16, '710 Patent, claims 1, 8, 12–16; '817 Patent, claims 1, 10–15; '025 Patent, claim 1; '028 Patent, claims 1, 7, 8, 13, 14, 18) | "component(s) manufactured for implantation in a patient's body" |
| **"degree of swelling"** (appears in: '710 Patent, claim 1; '025 patent, claims 2, 5, 7, 8; '028 Patent, claims 2, 8) | "weight ratio of swollen gel to dry gel" |
| **"gel content"** (appears in: '710 Patent, claim 1; '025 Patent, claims 4, 6, 7, 8; '028 Patent, claim 1) | "weight ratio of the gel to the overall composition" |

(ECF No. 70 at 18).

///

**LEGAL STANDARD**

"[S]ummary judgment is as appropriate in a patent case as in any other." *Avia Grp. Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1561 (Fed. Cir. 1988) (citations omitted). Rule 56 of the Federal Rules of Civil Procedure provides that "[a] party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *See id.* "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. The question is "whether a jury could reasonably find either that the [moving party] proved his case by the quality and quantity of evidence required by the governing law or that he did not." *Id.* "[A]ll justifiable inferences are to be drawn in [the nonmovant's] favor." *Id.* at 255.

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading," *Liberty Lobby*, 477 U.S. at 248, and affidavits or declarations supporting his opposition "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). The opposing party need not show the issue will be resolved conclusively in its favor. *See Liberty Lobby*, 477 U.S. at 248–49. All that is

necessary is submission of sufficient evidence to create a material factual dispute, thereby requiring a jury or judge to resolve the parties' differing versions at trial.  *See id*. at 249.

## ANALYSIS

### I.      Statements of Material Facts

The Court first addresses Plaintiff's request that the Court "enter an order stating all material facts that are not genuinely in dispute and treating such facts as established in the case."  (ECF No. 221 at 30).

Although Plaintiff does not cite to any legal authority in support of its request, the Court construes Plaintiff's request under Federal Rule of Civil Procedure 56(g).  Under Federal Rule of Civil Procedure 56(g), "[i]f the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case."  Fed. R. Civ. P. 56(g).

The Court notes in this case that Plaintiff submitted over a hundred pages of "facts" (ECF No. 221-1)—the *vast* majority of which Defendant disputes or objects to (ECF No. 235-1).  In light of breadth of this submission, Plaintiff's blanket request that the court "enter an order stating all material facts that are not genuinely in dispute" is overly broad and impractical.  *See SEC v. Retail Pro, Inc.*, No. 08cv1620-WQH-RBB, 2011 U.S. Dist. LEXIS 13095, at *8 (S.D. Cal. Feb. 10, 2011) (district courts have "open-ended discretion to decide whether it is practicable to determine what material facts are not genuinely at issue.").

For these reasons, the Court **DENIES** Plaintiff's request.

### II.     The Parties' *Daubert* Motions

Defendant moves to exclude, under *Daubert*, Plaintiff's damages expert, Michael K. Milani.  (ECF No. 224 at 25–27).  In turn, Plaintiff moves to exclude, under *Daubert*: (1) Defendant's expert, Sylvia D. Hall-Ellis, on the authenticity and public availability of twelve printed publications; (2) Defendant's experts, Dr. Gwo-Chin Lee and Dr. Geoffrey Higgs, M.D., on certain features and market demand for the technology at issue; and (3)

certain testimony from Defendant's damages expert, Julie Davis, regarding licenses on allegedly comparable technologies.   (ECF No. 221 at 27–30).   Because the Court has not relied upon any of the expert testimony or opinions at issue in the Parties respective *Daubert* motions in coming to its conclusions in this Order, the Court finds it appropriate to **DENY WITHOUT PREJUDICE** the Parties' *Daubert* motions, subject to re-filing at a date closer in time to trial, when the court sets a date for the Parties' motions in limine.

## III.   The Parties' Motions for Summary Judgment on Validity and Infringement

Plaintiff moves for partial summary judgment on its claims that: (1) Defendant infringes Claims 1 and 2 of the '025 Patent and Claim 1 of the '347 Patent; and (2) the '027 and '347 Patents are not invalid.  (ECF No. 221 at 7–19).

Defendant moves for summary judgment on its counterclaims of: (1) non-infringement of the Asserted Patents; and (2) that the Asserted Patents are invalid for lack of enablement.  (ECF No. 224 at 9–24).   The Parties' motions with respect to validity and infringement address the same or similar issues.   The Court's resolution of the Parties' motions is therefore guided by the same analysis.   For these reasons, the Court will consider these motions together.

### A.   *Validity*

The Court starts with the Parties' respective arguments on the validity of the Asserted Patents.   Plaintiff moves for partial summary judgment on the grounds that Defendant cannot establish the '347 or '025 Patents are invalid by anticipation, obviousness, lack of enablement, indefiniteness, or inadequate written description.  (*See* ECF No. 221 at 19–27).  Defendant, in turn, seeks summary judgment that the Asserted Claims of each Asserted Patent are invalid for lack of enablement.  (*See* ECF No. 224 at 9–14).

As set forth below:

1.   The Court **GRANTS** Plaintiff's motion of no anticipation with respect to the '347 and '025 Patents;

///

2.      The Court **DENIES** Plaintiff's motion of non-obviousness with respect to the '347 and '025 Patents;

3.      The Court **DENIES** the Parties' motions for summary judgment on the issue of enablement; and

4.      The Court **GRANTS** Plaintiff's motion for summary judgment of definiteness and adequate written description with respect to the '347 and '025 Patents.

### *1.   Anticipation and Obviousness*

Plaintiff moves for partial summary judgment that the '347 and '025 Patents are not anticipated by the Tomita '611 or Schaffner references.  (ECF No. 221 at 20). Plaintiff additionally moves for partial summary judgment that the '347 and '025 Patents are not rendered obvious by: (1) Tomita '611; (2) Schaffner; (3) Tomita '611 in combination with Shen; or (4) Schaffner in combination with Shen.  *Id.* at 24–26.  The Court addresses each of these arguments below.

### a.   Legal Standard

Patents are presumed valid.  *See* 35 U.S.C. § 282(a).  A party challenging the validity of a patent claim bears the burden of proving invalidity by clear and convincing evidence.  *See Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011).  Here, Plaintiff has moved for summary judgment of no anticipation and non-obviousness. (ECF No. 221 at 20).   Under Federal Circuit precedent:

> When the moving party does not have the burden of proof on the issue that is the subject of the summary judgment motion . . . the movant nonetheless bears the initial burden of coming forward with sufficient evidence to demonstrate that there is no material issue of fact that would preclude summary judgment, and that it is entitled to judgment as a matter of law.  If the movant meets its initial burden, the burden of coming forward shifts to the party opposing the motion.  The opposing party does not, at this stage, have the burden of establishing that it is entitled to judgment in its favor; it need only show either that the movant did not establish that it is entitled to judgment on undisputed facts or on the opposer's version of the facts, or that there are material issues of fact which require resolution at trial.

10

*Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 806–07 (Fed. Cir. 1999).

"Both anticipation under § 102 and obviousness under § 103 are two-step inquiries." *Medichem, S.A. v. Rolabo, S.L.*, 353 F.3d 928, 933 (Fed. Cir. 2003). The first step is "a proper construction of the claims[.]" *Id.* The second step "requires a comparison of the properly construed claim to the prior art." *Id.*

"To show that a patent claim is invalid as anticipated, the accused infringer must show by clear and convincing evidence that a single prior art reference discloses each and every element of a claimed invention." *Krippelz v. Ford Motor Co.*, 667 F.3d 1261, 1265 (Fed. Cir. 2012). "Anticipation is a question of fact[.]" *Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*, 471 F.3d 1369, 1375 (Fed. Cir. 2006). Summary judgment of no anticipation may be appropriate when there is no genuine issue of material fact and "no reasonable jury could find [anticipation] by clear and convincing evidence." *See Ctr. Admixture Pharm. Servs., Inc. v. Adv. Cardiac Sols., P.C.*, 482 F.3d 1347, 1358 (Fed. Cir. 2007).

In contrast, an obviousness inquiry assesses "the differences between the subject matter sought to be patented and the prior art" to ascertain whether "the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a) (pre-AIA). "Obviousness is a question of law premised on underlying findings of fact." *Eolas Techs., Inc. v. Microsoft Corp.*, 399 F.3d 1325, 1332 (Fed. Cir. 2002). These underlying factual determinations include: (1) the scope and content of the prior art; (2) differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art; and, if necessary, (4) secondary evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966). Secondary evidence of nonobviousness can include the commercial success of the invention, long-felt but unsolved need, and the failure of others. *Id.*

///

///

1           b.     Overview of References

2                i.     Japanese Patent Application No. 11-239611 ("Tomita

3                   '611")

4        The Tomita '611 reference is entitled "Sliding Member for Artificial Joints and

5 Manufacturing Method." (ECF No. 222-66 at 2). Tomita '611 is directed towards a

6 "sliding member for artificial joints, made of polyethylene[.]" *Id.* ¶ 1. The reference

7 describes improving the "wear resistance" of artificial joints by using a manufacturing

8 method that molds a "polyethylene composition" containing a Vitamin E "oxidation

9 inhibitor[.]" *Id.* ¶¶ 7, 15. "[A]ny form of polyethylene can be used" and "any form of

10 the [V]itamin E group can be used[.]" *Id.* ¶ 16. The polyethylene composition is

11 "brought into contact with an inert gas" prior to molding and irradiation is performed

12 "either during or after molding." *Id.* ¶ 8. Tomita '611 discloses radiation sterilization is

13 "preferable" as it "can easily and completely sterilize in a short period of time which can

14 also cause crosslinking of the polyethylene." *Id.* ¶ 20. Tomita '611 further discloses:

15 "[t]here is no particular limitation on dose of irradiation so long as sterilization can be

16 done, but it is preferable that the irradiation dose be enough to cause sufficient

17 crosslinking reactions in the polyethylene." *Id.* ¶ 21.

18                ii.     U.S. Patent No. 6,277,390 ("Schaffner")

19        The Schaffner Patent is entitled "UHMW Polyethylene for Implants." (ECF No.

20 222-67). Schaffner is directed to "the manufacture of implants for medical purposes."

21 *Id.* at col. 1:4–5. Specifically, Schaffner discloses a method of manufacturing an

22 "improved UHMWE polethylene material" using a process "wherein vitamin E is

23 dispersely embedded in the polyethylene during the manufacture of the implants." *Id.* at

24 cols. 1:59–2:1. The implants are "irradiated for sterilization using γ rays or electron

25 beams" such that the "free radicals are saturated more rapidly by vitamin E than by

26 oxygen, thus preventing the early oxidation and aging of the implant." *Id.* at col. 2:1–5.

27 ///

28 ///

iii.   PCT International Patent Application Publication No. WO 98/01085 ("Shen")

The Shen publication is entitled "Crosslinking of Polyethylene for Low Wear Using Radiation and Thermal Treatments."  (ECF No. 222-68 at 2).  Shen discloses "methods for enhancing the wear-resistance of polymers."  *Id.*  Specifically, Shen discloses a method for improving the wear resistance of a polymer by irradiating the polymer for crosslinking followed by thermal treatment to decrease free radicals.  *Id.* at 6:35–40, 49–52.   The polymeric compositions created are "useful for making *in vivo* implants."  *Id.* at 13:27–30.   Shen discloses the radiation dosages used are "preferably from about 1 to about 100 Mrad, and more preferably, from about 5 to about 25 Mrad, and most preferably from about 5 to about 10 Mrad."  *Id.* at 13:28–38.   The "most preferable range" is based on "what the inventors have determined to be a reasonable balance between improved wear resistance and minimal degradation of other important physical properties."  *Id.* at 13:35–38.

c.   Anticipation by Tomita '611 or Schaffner

i.   Irradiating at a Dosage Above 5 Mrad

The Parties dispute whether Tomita '611 or Schaffner individually disclose irradiating at a dosage "above 5 Mrad to about 10 Mrad" or "above 5 Mrad to about 25 Mrad," as recited in Claim 1 of the '025 Patent and Claims 1 and 2 of the '347 Patent.[4] (ECF Nos. 221 at 20–24; 235 at 16–19).

---

[4] Claim 1 of the '347 Patent recites "irradiating" the "oxidation-resistant medical implant at a radiation dose of above 5 Mrad to about 25 Mrad so as to crosslink the implant, without thermally treating the implant[.]" '347 Patent, Claim 1.  Claim 2 of the '347 Patent recites a narrower range of irradiation "from above 5 Mrad to about 10 Mrad." '347 Patent, Claim 2.

Claim 1 of the '025 Patent likewise recites "irradiating" the "orthopaedic material" at a "total radiation dose of above 5 Mrad to about 25 Mrad so as to crosslink the orthopaedic material . . . without thermally treating the orthopaedic material[.]" '025 Patent, Claim 1.

Here, neither Tomita '611 nor Schaffner expressly include the term "irradiating above 5 Mrad." This does not however, by itself, end the anticipation inquiry. Instead, "the dispositive question regarding anticipation is whether one skilled in the art would reasonably understand or infer from a prior art reference that every claim element is disclosed in that reference." *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1055 (Fed. Cir. 2010) (quotations omitted).

In this case, Tomita '611 and Schaffner both disclose irradiation ranges that broadly encompass the ranges claimed by the '025 and '347 Patents. Specifically, Tomita '611 discloses that while there is "no particular limitation on dose of irradiation so long as sterilization can be done" it is "*preferable*" that the irradiation dose be "0.1 Mrad *or greater*, and more preferably 0.5 to 5 Mrad." (ECF No. 222-66 at *Id.* ¶ 21). Likewise, Schaffner claims a method whereby the implant is exposed "within a protective gas atmosphere to γ ray or electron beam irradiation amounts of at least 2.5 Mrad[.]" (ECF No. 222-67, Claims 1 and 2).

Under Federal Circuit precedent, "[a] prior art reference that discloses an overlapping but different range than the claimed range can be anticipatory, even when the prior art range only partially or slightly overlaps with the claimed range." *Genentech, Inc. v. Hospira, Inc.*, 946 F.3d 1333, 1338 (Fed. Cir. 2020). "Once the patent challenger has established, through overlapping ranges, its *prima facie* case of anticipation, the court must evaluate whether the patentee has established that the claimed range is critical to the operability of the claimed invention." *Id.* (quotations omitted).

The question before the Court is whether the claimed irradiation ranges of "above 5 Mrad to about 25 Mrad" or "above 5 Mrad to about 10 Mrad" are "critical" to the operation of the '347 and '025 Patents. For example, in *Osram Sylvania, Inc. v. Am. Induction Techs., Inc.*, 701 F.3d 698 (Fed. Cir. 2012), the Federal Circuit rejected an anticipation argument where the challenged patent claimed a lamp with a buffer gas pressure range of "less than 0.5 torr" and the allegedly anticipatory patent reference disclosed a lamp operating at a buffer gas pressure range of "approximately 1 torr or

14

less." *Osram*, 701 F.3d at 701, 705.  In *Osram*, the patentee presented expert testimony and other evidence supporting its assertion the "less than 0.5 torr" limitation was "central to the invention claimed" and that "a lamp would operate differently at various points within the range disclosed[.]"  *Id.* at 706.  The challenged patent itself also disclosed that prior art lamps using pressures above the claimed range were inefficient and impractical. *Id.*   Based on this unrebutted evidence, the court found whether the prior art was anticipatory could not be resolved as a matter of law.  *Id.*

Plaintiff cites to the Federal Circuit's *Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991 (Fed. Cir. 2006) decision to argue that "[i]nfinite ranges cannot create a genuine dispute."  (ECF No. 245 at 11).  This argument is misplaced.  In *Atofina*, the patent-at-issue claimed a method of synthesizing difluoromethane at a temperature between 330–450 degrees.  *Atofina*, 441 F.3d at 993.  In contrast, the prior art disclosed a broader temperature range of 100–500 degrees.  *Id.* at 994.  The Federal Circuit held the prior art's teaching of a broader temperature range did not necessarily disclose every point within that range and that the "considerable difference between the claimed [temperature] range and the range in the prior art" precluded a finding of anticipation.  *Id.* at 999.

As the Federal Circuit later explained in *ClearValue, Inc. v. Pearl River Polymers, Inc.*, 668 F.3d 1345 (Fed. Cir. 2012), the essential inquiry in *Atofina* was whether the patented range was "critical."  In *Antofina*, the patent specification clearly stated "only a narrow temperature range" would enable the process to operate as claimed and that problems would occur when operating outside of this range.  *ClearValue, Inc.*, 668 F.3d at 1344.  Accordingly, "[i]n *Antofina*, the evidence showed that one of ordinary skill would have expected the synthesis process to operate differently outside the claimed temperature range, which the patentee described as 'critical' to enable the process to operate effectively."  *Id.* at 1345.

Unlike in *Atofina*, Plaintiff has not sufficiently shown the claimed ranges are critical as a matter of law.  Instead, the Court finds there are genuine issues of material fact on this dispute.  The patent specifications focus on utilizing radiation doses higher

than that typical for conventional sterilization (above 2.5 to 4 Mrads) and states in the case of UHMWPE, radiation doses from "about 5 Mrad to about 25 Mrad" and "about 5 Mrad to about 10 Mrad" are merely "preferable"—not critical—to "achiev[e]" a "reasonable balance between improved wear resistance and minimal degradation of other important physical properties." '347 Patent at cols. 6:59–7:1; 12:39–45.

There is also competing evidence on the record as to whether a person of ordinary skill in the art would expect the patented process to operate differently outside of the "above 5 Mrad to about 25 Mrad" or "above 5 Mrad to about 10 Mrad" ranges. Plaintiff's expert, Dr. Crowinshield, opined that the claimed dosage ranges are "critical" and a person of ordinary skill in the art would have understood "the difference between a sterilization irradiation dosage range and a highly cross-linking irradiation dosage range." (ECF No. 221-56 ¶ 322).

In contrast, Defendant's expert, Dr. Bellare, testified that "cross-linking happens right away," even at the 0.1 Mrad radiation dose disclosed by Tomita '611, and that other factors outside of the irradiation dosage, including the crystallinity of the polymer and whether antioxidants are added (or not) affect cross-linking. (ECF No. 236-15 at 189:8–11; 190:23–191:1). Defendant further submits Dr. McKellop's presentation notes from December 2000, which state an 85% drop in wear rate occurs in irradiation doses ranging from 0 to 5 Mrads (describing this range as the "region" where someone would get their "bang for the buck") and there is "less benefit" going from the 5 to 10 Mrad range and "really no benefit" above 0.15 Mrads. (ECF No. 235-6 ¶ 9). This evidence sufficiently raises a genuine issue of material fact as to whether the claimed ranges are "critical."

Even setting aside this "criticality" issue, at a minimum, there are genuine issues of fact as to scope of Tomita '611 and Schaffner in regards to the irradiation ranges they disclose. *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1381 (Fed. Cir. 2008) ("What a prior art reference discloses is, of course, a question of fact, and if there are disputes over material facts, whether the [prior art] anticipates . . . should be resolved at trial by the fact finder.").

16

Here, Defendant submitted Dr. Bellare's testimony, who opined Tomita '611 *does* disclose irradiation at a range "above 5 Mrad to 25 Mrad," because Tomita '611 provides "there is no particular limitation on dose of irradiation so long as sterilization can be done" it is merely "preferable that the irradiation dose be enough to cause sufficient cross-linking reactions." (ECF No. 236-15 at 175:2–11). As Dr. Bellare testified, Tomita '611 therefore discloses irradiation in the "5 Mrad to 25 Mrad" range because "sterilization still occurs" at this range. *Id.* at 173:24–175:6.

Plaintiff argues the patent examiner already "expressly determined" Tomita '611 "does not specifically mention using radiation doses from above 5 to about 100 Mrads" during the prosecution of the '347 Patent. (ECF No. 221 at 20–21). This statement, however, is taken out of context. In the portion of the prosecution history Plaintiff cites, the patent examiner stated: "[the Tomita '611 reference] teaches that the radiation dose *is not limited especially as long as it can sterilize the product*, but does not specifically mention using radiation doses from above 5 to about 100 Mrads." (ECF No. 222-58 at 8) (emphasis added).

In a separate section, the patent examiner observed that:

> [The Tomita '611 reference] teaches that the disclosed irradiation dose is a *preferred dose and not a limiting dose* that provides crosslinking as well as sterilization in the polyethylene/Vitamin E sliding member. Furthermore, "5 Mrad" is considered to encompass irradiation "above 5 Mrads[,]" as recited in the instant claims.

*Id.* at 7. Indeed, the examiner's conclusion Tomita '611 does not "limit" irradiation to dosages below 5 Mrad is also consistent with the testimony of Dr. Noble, Plaintiff's expert in a separate lawsuit, who testified Tomita '611 does not "prohibit" irradiation at a dosage above 5 Mrad:

///

///

///

17

Q. So Tomita is teaching people of skill in the art that the radiation dose is not limited to 5 megarads. Right?

A. That's outside his preferred range. But he doesn't prohibit it, that's correct.

(ECF No. 235-4 at 130:5–20).

Similarly, the Parties' dispute as to whether Schaffner discloses an irradiation range "above 5 Mrad to about 25 Mrad" or "above 5 Mrad to about 10 Mrad" largely amounts to a battle of the experts with Dr. Crowinshield opining one way and Dr. Bellare responding in the opposite. (*See* ECF No. 235-1 ¶¶ 111–12). This conflicting expert testimony creates a genuine dispute of material fact precluding summary judgment. *See Icon-IP Pty Ltd. v. Specialized Bicycle Components, Inc*., 87 F. Supp. 3d 928, 954 (N.D. Cal. 2015) (finding "conflicting expert testimony creates a genuine dispute of material fact precluding summary judgment of anticipation[.]").

For these reasons, the Court concludes summary judgment on these grounds is inappropriate.

### ii.    High-Dosage Irradiation Without Thermal Treatment

In its Motion, Plaintiff additionally argues that even if Tomita '611 and Schaffner disclose high-dosage irradiation, they do not expressly or inherently disclose high-dose irradiation without thermal treatment. (ECF No. 221 at 22–24).[5]

In support of its argument, Plaintiff points to: (1) the Patent Trial and Appeal Board ("PTAB")'s decision not to institute *inter partes review* proceedings in IPR No. 2015-00512 (ECF No. 222-65); (2) subsequent patent office actions in the '817, '025, and '028 Patents; and (3) the report and deposition of its expert, Dr. Crowinshield. (ECF Nos. 221 at 22–24; 221-1 ¶¶ 105–07, 116). For example, Dr. Crowinshield opined in his

---

[5] The "without thermal treatment" limitation is comparable to a "negative limitation" which defines the claimed invention by what it is not. *See generally Upsher-Smith Labs., Inc. v. Pamlab, L.L.C.*, 412 F.3d 1319, 1321–23 (Fed. Cir. 2005).

expert report that Tomita '611 and Schaffner do not expressly or inherently disclose the abandonment of thermal treatment.  (ECF No. 221-56 ¶¶ 328–33, 353–58).  Given the above, the Court finds Plaintiff has sufficiently met its initial burden on this issue.  *Vivid Techs.*, 200 F.3d at 806–07.

The Court finds Defendant has not, however, met its burden in responding.   In its briefs, Defendant addresses Plaintiff's thermal treatment arguments *only* in the context of obviousness—not anticipation. (ECF No. 235 at 19–21).   Specifically, the crux of Defendant's response is that "a POSITA would have found it *obvious* that [] thermal treatment was not necessary for a polyethylene including an antioxidant even at a radiation dose above 5 Mrad." *Id.* at 19 (emphasis added).  Defendant fails to address Plaintiff's argument that neither Tomita '611 nor Schaffner *expressly* or *inherently* disclose *not using* a thermal treatment step.  As the PTAB already persuasively noted, this is different from simply contending that Tomita '611 and Schaffner are *silent* as to this negative limitation.   (*See* ECF No. 222-65 at 11).

Anticipation and obviousness "are separate and distinct concepts." *Jones v. Hardy*, 727 F.2d 1524, 1529 (Fed. Cir. 1984).   "[O]bviousness is not inherent anticipation," *Trintec Indus., Inc. v. Top-U.S.A. Corp.*, 295 F.3d 1292, 1296 (Fed. Cir. 2002), and here, Defendant makes no effort to distinguish between the two.

Defendant's failure to address Plaintiff's thermal treatment arguments in the anticipation context is fatal to its anticipation claims.  *See* Fed. R. Civ. P. 56(e); *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991) (holding that a district court properly granted summary judgment where non-moving party "failed to show that there remained genuine issues of fact.").

For these reasons, the Court **GRANTS** Plaintiff's Motion for Partial Summary Judgment of no anticipation on these grounds.

///

///

///

d.   Obviousness by Tomita '611 or Schaffner, Individually, or in Combination with Shen

The Parties dispute whether Tomita '611 or Schaffner individually or in combination with Shen, render the '025 and '347 Patents obvious.  (ECF Nos. 221 at 24–26; 235 at 19–21).  Specifically, Plaintiff argues Tomita '611 and Schaffner do not render obvious the patented limitation of irradiating an oxidation-resistant implant at a radiation dosage above 5 Mrad without thermal treatment, as recited in Claim 1 of the '025 Patent and Claims 1 and 2 of the '347 Patent.  (ECF No. 221 at 24–26).  Plaintiff further contends Shen does not "cure" these deficiencies present in Tomita '611 and Schaffner. *Id.*

The Court first addresses Tomita '611 and Schaffner individually.  "In appropriate circumstances, a single prior art reference can render a claim obvious." *SIBIA Neurosciences, Inc. v. Cadus Pharm. Corp.*, 225 F.3d 1349, 1356 (Fed. Cir. 2000).  "However, there must be a showing of a suggestion or motivation to modify the teachings of that reference to the claimed invention in order to support the obviousness conclusion." *Id.*  "This suggestion or motivation may be derived from the prior art reference itself, from the knowledge of one of ordinary skill in the art, or from the nature of the problem to be solved." *Id.*

The Court notes its findings as to whether Tomita '611 or Schaffner disclose irradiation at dosages "above 5 Mrad to about 25 Mrad" or "above 5 Mrad to about 10 Mrad" in the anticipation context, apply equally to the Court's obviousness analysis.  Under Federal Circuit precedent, "[a] *prima facie* case of obviousness typically exists when the ranges of a claimed composition overlap the ranges disclosed in the prior art." *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003).  "In general, an applicant may overcome a *prima facie* case of obviousness by establishing that the claimed range is critical, generally by showing that the claimed range achieves unexpected results relative to the prior art range." *Id.* at 1330 (quotations omitted); *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1322 (Fed. Cir. 2004) ("Where the difference between the

20

claimed invention and the prior art is some range or other variable within the range . . . the patentee must show that the particular range is critical, generally by showing that the claimed range achieves unexpected results.") (quotations omitted).  Here, as already discussed above, a genuine issue of material fact exists as to the criticality of the claimed radiation ranges.  Summary judgment on these grounds is therefore inappropriate.

As such, the question before the Court is whether Tomita '611 or Schaffner, alone or in combination with Shen, render obvious the negative limitation of omitting thermal treatment.  Here, the Court finds there is a genuine issue of material fact as to whether a person of ordinary skill in the art would have found it obvious to omit thermal treatment after subjecting an oxidation-resistant polymer material to high-dose irradiation.  In his report, Defendant's expert, Dr. Bellare, opined "[a] person of ordinary skill in the art would have been motivated to avoid thermal treatments that negatively impact important physical properties of an implant."  (*See e.g.*, ECF No. 235-5 ¶¶ 472, 480, 514).

Defendant also points to the deposition testimony of the inventors, which Defendant argues infer that a person of ordinary skill would understand thermal treatment to be unnecessary for oxidation-resistant materials.  (ECF No. 235 at 20).

Specifically, Dr. McKellop testified:

> [COUNSEL]:      "And you understood at that moment that if you had the oxidation-resistant material, you wouldn't have to thermally treat, correct?"
>
> [DR. MCKELLOP]:      "Yes."
>
> [COUNSEL]:      "And why did you understand that to be the case?"
>
> [DR. MCKELLOP]:      "Thermal treatment is done to neutralize free radicals.  If you don't do that, then, as oxidation diffuses into the polyethylene over -- could be years of time, it combines with the free radicals and oxidizes poly and makes it very weak and brittle.

21

> So, obviously, if the polyethylene is resistant to oxidation, even though it has free radicals, then you don't need to thermally treat it.  So it presents another method of achieving the goal that's different from what we were already doing."

(ECF No. 225-9 at 49:3–22).

Similarly, Dr. Shen testified:

> [DR. SHEN]:      "[I]f you add vitamin E to polyethylene, then it's oxidation-resistant.  I don't know why you wanted to remelt for this vitamin-E-containing polyethylene.  It's useless and a waste of time."

(ECF No. 224-2 at 150:1–4).

Plaintiff argues Defendant mischaracterizes this testimony, because the omission of thermal treatment is "necessarily tied" to high dosage irradiation.  (ECF No. 252 at 10).   Dr. McKellop and Dr. Shen's testimony, however, implies a person of ordinary skill in the art would have omitted thermal treatment based on whether the polymer was oxidation-resistant—for example, by adding Vitamin E to the polymer composition—and not based on the dosage of radiation applied.  (ECF Nos. 225-9 at 49:15–17 ("So, obviously, *if the polyethylene is resistant to oxidation*, even though it has free radicals, then you don't need to thermally treat it.") (emphasis added); 224-2 at 150:1–3 ("*[I]f you add vitamin E to polyethylene, then it's oxidation-resistant*. I don't know why you wanted to remelt for this vitamin-E-containing polyethylene.") (emphasis added).

Even if the Court were to assume Plaintiff is correct that the omission of thermal treatment is tied to high-dose irradiation, as the Court already held above, there are genuine issues of material fact as to whether Tomita '611 and Schaffner teach high dosage irradiation (above dosages conventionally used for sterilization).   Like anticipation, these issues are also material to an obviousness determination and preclude summary judgment.  *Zoltek Corp. v. United States*, 95 Fed. Cl. 681, 691 (2010) (scope and content of prior art in obviousness inquiry is a factual question).

///

///

22

1   Having found that genuine issues of material fact exist with respect to single
2   reference obviousness, the Court need not resolve whether there are genuine issues of
3   material fact that the combinations of Tomita '611 or Schaffner in view of Shen would
4   render the '347 and '025 Patents obvious.

5   For these reasons, the Court **DENIES** Plaintiff's Motion for Partial Summary
6   Judgment of non-obviousness.

7               *2.   Enablement*

8   Defendant seeks summary judgment that the Asserted Claims of each Asserted
9   Patent are invalid for lack of enablement.  (ECF No. 224 at 9–14).  Plaintiff, in turn,
10   seeks summary judgment that Defendant cannot meet its burden of proving the Asserted
11   Claims of the '347 and '025 Patents are not enabled.  (ECF No. 221 at 27).

12           *a.*   Legal Standard

13   "Enablement serves the dual function in the patent system of ensuring adequate
14   disclosure of the claimed invention and of preventing claims broader than the disclosed
15   invention.  This important doctrine prevents both inadequate disclosure of an invention
16   and overbroad claiming that might otherwise attempt to cover more than was actually
17   invented." *MagSil Corp. v. Hitachi Global Storage Techs., Inc.*, 687 F.3d 1377, 1380–81
18   (Fed. Cir. 2012) (citations omitted).  "Enablement is a question of law based on
19   underlying factual findings." *Id.* at 1380.

20   "To prove that a claim is invalid for lack of enablement, a challenger must show by
21   clear and convincing evidence that a person of ordinary skill in the art would not be able
22   to practice the claimed invention without 'undue experimentation.'" *Alcon Research Ltd.*
23   *v. Barr Labs., Inc.*, 745 F.3d 1180, 1188 (Fed. Cir. 2014) (citing *In re Wands*, 858 F.2d
24   731, 736–37 (Fed. Cir. 1988)).

25   The "*Wands* factors" may be considered when determining if a claimed invention
26   can be practiced without undue experimentation:

27           (1) [T]he quantity of experimentation necessary, (2) the amount
28           of direction or guidance presented, (3) the presence or absence

of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.

*Cephalon, Inc. v. Watson Pharm., Inc.*, 707 F.3d 1330, 1336 (Fed. Cir. 2013) (quoting *Wands*, 858 F.2d at 737).  "These factors while illustrative are not mandatory."  *Id.* at 1336.

<blockquote>b.    Analysis</blockquote>

Here, the question before the Court is whether practicing the full scope of the Asserted Claims requires undue experimentation.  The independent Asserted Claims each recite a method of producing a wear-resistant and oxidation-resistant medical implant, including the steps of: "providing" an "oxidation-resistant" medical implant or orthopedic material comprising "polyethylene" or a "polyethylene component."  *See* '347 Patent, Claim 1; '710 Patent, Claim 1; '817 Patent, Claim 1; '025 Patent, Claim 1; '028 Patent, Claims 1, 8 and 14.  The "oxidation-resistant" implant or orthopaedic material is subjected to a radiation dose "above 5 Mrad" to induce crosslinking and improve wear resistance without the need for thermal treatment.  *Id.*

Defendant argues the Asserted Patents do not enable one of ordinary skill in the art to practice the patented method.  (ECF No. 224 at 9–14).  Specifically, Defendant argues the patent specifications fail to describe "which antioxidant to choose, what concentration of antioxidant to include in the polyethylene, or any explanation of how the antioxidant would affect the ability of the polyethylene to crosslink at any given radiation level."  *Id.* In Opposition, Plaintiff argues that the specifications of the Asserted Patents disclose "several known ways by which oxidation-resistant polyethylenes could be produced." (ECF No. 232 at 23).

It is true the Asserted Patent specifications contain some guidance as to how oxidation-resistant polyethylenes can be produced.  Specifically, the specifications disclose "adding one or more antioxidants . . . to render the polyethylene oxidation resistant."  *See* '347 Patent, col. 8:30–34.  The specifications also provide for a number of

"non-limiting examples of conventional antioxidants which may be used" including "vitamin A, vitamin C, and vitamin E" and "common antioxidants used to prevent or inhibit the oxidation of polymer, such as, members of the classes of phenols, aromatic amines, and salts and condensation products of amines and aminophenols with aldehydes, ketones, and thio compounds." *Id.* at col. 8:34–40. The specifications direct the reader to "[a]n example of the application of this aspect" in references authored by Morita and Tomita "who used Vitamin E to improve the oxidation resistance of their UHMWPE." *See id.* at col. 8:43–47.

However, Defendant is also correct the specifications do not disclose which specific antioxidants and at what concentrations would work to reduce oxidation and improve crosslinking in a polyethylene. Some experimentation would therefore be necessary. Nevertheless, Defendant has not met its summary judgment burden of showing, by clear and convincing evidence, that the amount of experimentation necessary would be excessive as a matter of law. *Cephalon*, 707 F.3d at 1337 ("Because we must presume a patent enabled, the challenger bears the burden, throughout the litigation, of proving lack of enablement by clear and convincing evidence.").

Defendant argues Plaintiff's expert, Dr. Crowinshield, "recognized" there are antioxidants listed in the specifications of the Asserted Patents that are incompatible with polyethylene. (ECF No. 224 at 12). This mischaracterizes Dr. Crowinshield's testimony. Dr. Crowinshield testified the only antioxidant he was *aware* of that had been used in medical implants was Vitamin E, and he would be speculating as to whether other antioxidants, such as Vitamin C, ketones, and aromatic amines, would work in this capacity. (ECF No. 225-16 at 30:13–32:14).[6] Defendant also cites to the report of its expert, Dr. Bellare as showing that some of the individual antioxidants identified in the specifications are "inoperable." (ECF Nos. 224-1 ¶ 15; 248 at 8). This section of Dr.

---

[6] Dr. Crowinshield did "speculate" that because Vitamin C is water-soluble, it may not work as an antioxidant for a medical implant. (ECF No. 225-16 at 31:12–22).

Bellare's report however, states only that the addition of certain antioxidants (such as Vitamin C) into polyethylene may be "questionable in maintaining oxidation resistance in the long term[.]" (ECF No. 225-18 ¶ 846).

Even if, assuming for the sake of argument, some of the claimed combinations of antioxidants to polyethylene are inoperative, the Asserted Claims would not necessarily be invalid for lack of enablement for this reason. "It is not a function of the claims to specifically exclude . . . possible inoperative substances[.]" *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1576 (Fed. Cir. 1984) (quotations omitted); *see Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 344 F. Supp. 3d 890, 896 (E.D. Tex. 2018) ("This is not the test for enablement. If it was, any claim that encompasses an inoperative embodiment . . . would automatically be invalid."). Instead, the question is whether the number of "inoperative combinations" is so significant it would in effect "force[] one of ordinary skill in the art to experiment unduly in order to practice the claimed invention[.]" *Atlas Powder Co.*, 750 F.2d at 1576. At this juncture, Defendant has not sufficiently shown this to be the case.

"Undue experimentation is a matter of degree." *Wyeth & Cordis Corp. v. Abbott Labs.*, 720 F.3d 1380, 1385–86 (Fed. Cir. 2013). The test for undue experimentation "is not merely quantitative, since a considerable amount of experimentation is permissible, if it is merely routine, or if the specification in question provides a reasonable amount of guidance with respect to the direction in which the experimentation should proceed to enable the determination of how to practice a desired embodiment of the claimed invention." *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1360 (Fed. Cir. 1998) (quotations omitted).

In this case, Dr. Crowinshield testified there exist "pretty well-established protocols for testing oxidation resistance in polyethylene implants" and these experiments are "straightforward and well communicated." (ECF No. 225-16 at 33:9–14). Dr. Crowinshield described these "protocols" as being "associated with what's generally called acceleration aging of the polyethylene, and testing of oxidation indexes after

26

acceleration aging." *Id.* at 33:17–20. Likewise, the Asserted Patents disclose: (1) selecting a candidate polyethylene; (2) selecting a method of increasing oxidation resistance (encompassing adding an antioxidant); and then (3) testing the resultant oxidation resistance by, for example, "irradiating the polyethylene to the desired level of crosslinking, and then subjecting it to shelf aging" or "accelerated aging" and "measuring the resultant level of oxidation." *See* '347 Patent at col. 13:39–63. As the Federal Circuit has held, "extensive experimentation does not necessarily render the experiments unduly extensive where the experiments involve repetition of known or commonly used techniques." *Cephalon*, 707 F.3d at 1338.

In support of its enablement defense, Defendant argues the patent specifications lack "working examples" and that the inventors "never made an implant containing an antioxidant or ever tested whether such an implant would be resistant to oxidation after high radiation doses without a thermal treatment." (ECF No 224 at 13). Instead, Defendant points to the fact that implants made by DePuy Orthopaedics, Inc. using methods "similar" to those disclosed in the Asserted Claims were not introduced until ten years after the filing date of the Asserted Patents and that Dr. McKellop purportedly credited the work of Dr. Oral as providing "experimental proof" that the Asserted Patents "provide[] an oxidation resistant implant." (ECF No. 224 at 11).

These arguments are not persuasive. "[A] patent does not need to guarantee that the invention works for a claim to be enabled. It is well settled that an invention may be patented before it is actually reduced to practice." *Alcon Research Ltd.*, 745 F.3d at 1189. "Similarly, a patentee is not required to provide actual working examples[.]" *Id.* "Nor is it 'a requirement of patentability that an inventor correctly set forth, or even know, how or why the invention works.'" *Id.* at 1190.

At this stage, the Court concludes Defendant has not met its summary judgment burden of showing, by clear and convincing evidence that the Asserted Patents are invalid for lack of enablement. This does not mean, conversely, however, that Plaintiff is entitled to summary judgment that the '347 and '025 Patents are enabled. The broad

scope of the claims, Dr. Bellare's report, the alleged extended period of time before reduction to practice, and the Parties' disputes regarding inoperative embodiments and unpredictability in the state of the art, are sufficient to raise a genuine issue of material fact as to the amount and type of experimentation required.

For these reasons, the Court **DENIES** the Parties' Motions for Summary Judgment on the issue of enablement.

### 3.   *Defendant's Remaining Invalidity Defenses*

Plaintiff argues it is entitled to summary judgment that the '347 and '025 Patents are not invalid for indefiniteness and inadequate written description because Defendant "failed to disclose any proposed expert testimony on these theories." (ECF No. 221 at 26). Specifically, Plaintiff contends Defendant's theories are limited solely to "a series of single-sentence conclusory statements in [Defendant's Amended Invalidity Contentions]." *Id.* Defendant does not dispute it has not proffered expert testimony on these defenses. (ECF No. 235 at 25). Instead, Defendant argues it is not required to submit expert evidence to support these defenses because invalidity can be proven by "documentary evidence" or "cross-examination testimony" of Plaintiff's expert. *Id.*

### a.   Indefiniteness

A patent must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as [the] invention." 35 U.S.C. § 112, ¶ 2 (pre-AIA). A claim fails to satisfy this statutory requirement and is thus invalid for indefiniteness if its language, when read in light of the specification and the prosecution history, "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). Indefiniteness is a "question of law that may contain underlying facts." *Berkheimer v. HP Inc.*, 890 F.3d 1369, 1370 (Fed. Cir. 2018). "[A] party challenging patent validity on indefiniteness grounds carries the burden of proof." *Bosch Auto. Serv. Sols., LLC v. Matal*, 878 F.3d 1027, 1040 (Fed. Cir. 2017).

///

In its Amended Invalidity Contentions, Defendant identified a number of asserted claim limitations as being indefinite.   (ECF No. 222-70 at 3–6).   Defendant's Contentions, however, state simply that the limitations are "invalid" for "indefiniteness" because they "fail[] to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  *Id.*  Similarly, in its summary judgment papers, Defendant's substantive indefiniteness argument is relegated to a single sentence asserting that "as an example, the specification does not require a level of oxidation resistance" and "[Plaintiff's] experts and named inventors have regularly taken inconsistent positions as to the meaning of related claim terms."  (ECF No. 235 at 6).

Although Defendant is correct a claim can be found indefinite without reliance on extrinsic evidence, *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014), this argument misses the mark here.  Defendant's failure to provide a sufficient explanation of how the Asserted Claims are indefinite prevents the Court from properly considering its argument.  Defendant "cannot rely merely on conclusory assertions and expect this Court to rule in [its] favor."  *Altair Instruments, Inc. v. Kelley W. Enters., Ltd. Liab. Co.*, No. CV 15-8115-R, 2016 U.S. Dist. LEXIS 188922, at *5 (C.D. Cal. May 26, 2016); *see Celotex*, 477 U.S. at 322 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").  Defendant had the opportunity to present its indefiniteness arguments at summary judgment and declined to adequately do so here. For these reasons, Plaintiff's Motion for Partial Summary Judgment on the definiteness of the '347 and '025 Patents is **GRANTED.**

### b.    Written Description

The written description requirement of 35 U.S.C. § 112, ¶ 1 (pre-AIA) provides, in pertinent part, that:

> The specification shall contain a written description of the invention, and of the manner and process of making and using

29

> it, in such full, clear, concise, and exact terms as to enable any
> person skilled in the art to which it pertains, or with which it is
> most nearly connected, to make and use the same[.]

To satisfy the written description requirement, "the applicant must 'convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention,' and demonstrate that by disclosure in the specification of the patent." *Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*, 541 F.3d 1115, 1122 (Fed. Cir. 2008) (quoting *Vas-Cath Inc. v. Sakharam D. Mahurkar*, 935 F.2d 1555, 1563–64 (Fed. Cir. 1991)).  Assessing such "possession as shown in the disclosure" requires "an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010).  Ultimately, "the specification must describe an invention understandable to that skilled artisan and show that the inventor actually invented the invention claimed." *Id.*  The Federal Circuit has "long held" this inquiry "is a question of fact." *Id.* at 1351.  "[A]lthough written description and enablement often rise and fall together, requiring a written description of the invention plays a vital role in curtailing claims that do not require undue experimentation to make and use, and thus satisfy enablement, but that have not been invented, and thus cannot be described." *Id.* at 1352.

As an initial matter, the Court rejects Plaintiff's broad premise that expert testimony is required to prove invalidity based on inadequate written description.  As the Federal Circuit has stated, "[a] patent can be held invalid for failure to meet the written description requirement based solely on the language of the patent specification.  After all, it is in the patent specification where the written description requirement must be met." *Univ. of Rochester v. G.D. Searle & Co.*, 358 F.3d 916, 927 (Fed. Cir. 2004).

Nevertheless, in response to Plaintiff's partial summary judgment motion, Defendant was required "to come forward with evidence raising at least a genuine issue of fact regarding whether the [Asserted Patents] fail[] the written description requirement." *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1072–73 (Fed.

Cir. 2005).  Here, Defendant argues a finding of invalidity for inadequate written description would be "appropriate" based on the Federal Circuit's *Nuvo Pharmaceuticals (Ireland) Designated Activity Co. v. Dr. Reddy's Labs. Inc.*, 923 F.3d 1368 (Fed. Cir. 2019) decision.  (ECF No. 235 at 25–26).

In *Nuvo*, the patents-in-suit were directed to a controlled release pharmaceutical composition used to control pain using non-steroidal anti-inflammatory drugs ("NSAIDs").  *Nuvo*, 923 F.3d at 1372–73.  The compositions addressed the undesirable side effects of using a NSAID, which occurs when acid is present in the stomach and upper small intestine, through the use of an acid inhibitor.  *Id.*  To address these side-effects, the asserted patents recited claims for a pharmaceutical composition comprising: (1) an NSAID component coated to prevent its release before pH was increased to a certain desired level; and (2) an uncoated proton pump inhibitor ("PPI")—a common acid inhibitor—"effective to raise gastric pH to at least 3.5"  *Id.* at 1372–73; 1378.

The Federal Circuit held the patents were invalid for inadequate written description because:

> The inventor chose to claim the therapeutic effectiveness of uncoated PPI, but he did not adequately describe the efficacy of uncoated PPI so as to demonstrate to ordinarily skilled artisans that he possessed and actually invented what he claimed.

*Id.* at 1384.  Specifically, the Federal Circuit found that:

> [T]he specification provides nothing more than the mere claim that uncoated PPI might work, even though persons of ordinary skill in the art would not have thought it would work, the specification is fatally flawed.  It does not demonstrate that the inventor possessed more than a mere wish or hope that uncoated PPI would work, and thus it does not demonstrate that he actually invented what he claimed: an amount of *uncoated* PPI that is *effective* to raise the gastric pH to at least 3.5.

*Id.* at 1381.

///

31

According to Defendant, "there is nothing" in the Asserted Patent specifications "that explains *why* an antioxidant would be effective" in reducing oxidation for implants irradiated "at a radiation dose above 5 Mrad"—the specification merely instructs the reader to "add an antioxidant."  (ECF No. 235 at 25).   This argument misinterprets *Nuvo*'s holding.   In *Nuvo*, the Federal Circuit's decision was predicated on the patents claiming "uncoated PPI effective to raise the gastric pH to at least 3.5[.]"  *Nuvo*, 923 F.3d at 1377, 1382.   In considering this explicit claim language, the Federal Circuit held there was no "hook or disclosure in the specification that an ordinary skilled artisan [could] rely on to understand that the inventor possessed effective uncoated PPI."  *Id.* at 1382.

Here, the Asserted Patent claims do not claim an "effective" antioxidant. Defendant's argument that the Asserted Patent specifications must nevertheless "explain[] why an antioxidant would be effective at a radiation dose above 5 Mrad" (ECF No. 235 at 25) is misplaced.   As the Federal Circuit made clear in *Nuvo*, Federal Circuit precedent "*does not require* [a] theory or explanation of how or *why* a claimed [invention] will be effective[.]"  *Nuvo*, 923 F.3d at 1380 (emphasis added).   Instead, the written description requirement queries whether a person of ordinary skill in the art would "recognize that the inventor invented what is claimed."  *Ariad*, 598 F.3d at 1351 (quotations omitted).

Defendant's argument "experimental proof" of the patented invention did not exist until after invention is also unavailing.  (ECF No. 235 at 26).   The Federal Circuit has "made clear that the written description requirement does not demand either examples or an actual reduction to practice; a constructive reduction to practice that in a definite way identifies the claimed invention can satisfy the written description requirement."  *Ariad*, 598 F.3d at 1352.

Similarly, Defendant's argument Dr. McKellop's deposition testimony evidences the lack of written description is unpersuasive.   Defendant argues Dr. McKellop's testimony supports the proposition the inventors merely "believed" the claimed invention would work.  (ECF No. 235 at 25–26).   This mischaracterizes Dr. McKellop's testimony.

32

In context, Dr. McKellop testified his "belief" the patented invention would work was based on: (1) his experience; (2) "literature showing that, as you increased the level of crosslinking, the wear resistance improved"; and (3) "literature saying that if you put an antioxidant into a polyethylene, you could improve its oxidation resistance."  (ECF No. 224-9 at 80:23–81:24).   Dr. McKellop's "belief" that an antioxidant containing polyethylene would be wear-resistant amounted to "more than a mere wish or hope."

Defendant also cannot simply cross-examine Plaintiff's expert, without evidentiary support, to meet its burden.  Cross-examination is not appropriately used in a written description inquiry at the expense of a meaningful analysis of the specification and claims from the perspective of a person of ordinary skill in the art.  "To hold otherwise would improperly empower cross-examination with the ability to defeat nearly all motions for summary judgment."  *Suffolk Techs., LLC v. AOL Inc.*, 752 F.3d 1358, 1367 (Fed. Cir. 2014).

On the current record, Defendant has not come forward with evidence raising a genuine issue of fact supporting its arguments the Asserted Patents are invalid for inadequate written description.  *Lucent Techs. Inc. v. Gateway, Inc.*, Nos. 02CV2060-B(CAB); 03CV0699-B (CAB); 03CV1108-B (CAB), 2007 U.S. Dist. LEXIS 35557, at *19 (S.D. Cal. May 15, 2007) (granting summary judgment of no invalidity due to written description where defendant's assertion that the patent alone without expert testimony would evidence invalidity under a clear and convincing standard was "unrealistic").

For these reasons, Plaintiff's Motion for Partial Summary Judgment of adequate written description of the '347 and '025 Patents is **GRANTED.**

### B.    Infringement

The Court next turns to the Parties' respective arguments on the alleged infringement of the Asserted Patents.  Plaintiff moves for partial summary judgment that Defendant infringes Claims 1 and 2 of the '025 Patent and Claim 1 of the '347 Patent.

///

(*See* ECF No. 221 at 7–19).   Defendant, in turn, seeks summary judgment that the Asserted Claims of each Asserted Patent are not infringed.  (*See* ECF No. 224 at 14–21).

As set forth below:

1.   The Court **GRANTS** Defendant's Motion for Summary Judgment that Defendant is not liable for infringement under the "use" prong of § 271(a);

2.   The Court **GRANTS** Plaintiff's Motion for Partial Summary Judgment that Defendant infringes Claim 1 of the '025 Patent and **DENIES** Plaintiff's Motion that Defendant infringes Claim 2 of the '025 Patent or Claim 1 of the '347 Patent.

3.   The Court **DENIES** Defendant's Motion for Summary Judgment of non-infringement of the Asserted Patents.

4.   The Court **GRANTS** Defendant's Motion for Summary Judgment with respect to pre-suit willful and induced infringement.

### *1.   Direct Infringement Under 35 U.S.C. § 271(a)*

Defendant contends Plaintiff's infringement claims under 35 U.S.C. § 271(a) fail because the Accused Methods are not "performed" in the United States.  (ECF No. 224 at 21–22).  Title 35 of the United States Code § 271(a) "sets forth the requirements for a claim of direct infringement of a patent."  *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1313 (Fed. Cir. 2005).   It provides:

> Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

35 U.S.C. § 271(a).

Defendant appears to be making its argument under the "use" prong of § 271(a).  As the Federal Circuit has held:

> Because a process is nothing more than the sequence of actions of which it is comprised, the use of a process necessarily involves doing or performing each of the steps recited.  This is unlike use of a system as a whole, in which the components are

34

> used collectively, not individually.  We therefore hold that a process cannot be used "within" the United States as required by section 271(a) *unless each of the steps is performed within this country*.

*NTP, Inc.*, 418 F.3d at 1318 (emphasis added).  Here, it is undisputed that Orthoplastics is located in the United Kingdom and performs certain manufacturing steps.  (ECF No. 232-1 ¶ 9).  Specifically, Orthoplastics: (1) obtains from Celanese Corporation UHMWPE resin pre-mixed within Vitamin E; (2) uses compression molding to fabricate sheets of UHMWPE with Vitamin E and cuts them into bars; and (3) contracts with another third-party, Steris, to irradiate the bars.  (ECF Nos. 224-5 at 10–11; 232-1 ¶ 19).

Plaintiff argues Defendant and Orthoplastics can properly be considered a "single entity" for infringement purposes such that Orthoplastics' infringing actions would be attributable to Defendant.  (ECF No. 232 at 19–21).  Plaintiff's argument, however, confuses the "single-entity requirement under § 271(a), which limits direct infringement liability only to circumstances 'where all steps of a claimed method are performed by or attributable to a single entity.'"  *Syngenta Crop Prot., LLC v. Willowood, LLC*, 944 F.3d 1344 (Fed. Cir. 2019) with the territorial limitations of § 271(a).  The fact that Orthoplastics' actions could be attributed to Defendant does not extend patent protection to cover extraterritorial conduct that would not otherwise trigger liability.  "Section 271(a) is only actionable against patent infringement that occurs within the United States."  *NTP, Inc.*, 418 F.3d at 1313.

Indeed, this point is buttressed by *Ormco Corp. v. Align Tech., Inc.*, 609 F. Supp. 2d 1057 (C.D. Cal. 2009)—a case Plaintiff cites (ECF No. 232 at 19).  In *Ormco*, the plaintiff argued that the defendant was liable under § 271(a) when it performed one step of the claims at issue and directed its Costa Rican subsidiary to perform the remaining steps on its behalf.  *Ormco Corp.*, 609 F. Supp. 2d at 1068.

The *Ormco* Court held that:

> [T]he "joint" aspect does not eliminate the need to show all steps or stages of the claimed process are performed in the

> United States. *The theory of joint infringement concerns who performed the steps of a claim, not where the steps were performed.*

*Id.* at 1068 (emphasis added).  This Court agrees.

For these reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment that Defendant is not liable for infringement under the "use" prong of § 271(a).[7]

### 2.   *Literal Infringement/Infringement Under the Doctrine of Equivalents*

"The patentee bears the burden of proving infringement by a preponderance of the evidence." *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991).  To demonstrate infringement of a patented method, a plaintiff must show that "all steps of the claimed method . . . [are] performed." *Mirror Worlds, LLC v. Apple Inc.*, 692 F.3d 1351, 1358 (Fed. Cir. 2012).  "Infringement is a two-step inquiry in which a court must first construe disputed claim terms, and then compare the properly construed claims to the accused [method]." *Nazomi Communs., Inc. v. ARM Holdings, PLC*, 403 F.3d 1364, 1367–68 (Fed. Cir. 2005).  Although the first step, claim construction, is a question of law, "infringement, either literal or under the doctrine of equivalents, is a question of fact." *RF Del., Inc. v. Pac. Keystone Techs., Inc.*, 326 F.3d 1255, 1266 (Fed. Cir. 2003).

---

[7] The Parties appear to dispute whether Defendant can still be held liable under the "sell" or "offer to sell" prongs of § 271(a). (ECF No. 232 at 20–21).  Indeed, Plaintiff's counsel conceded at the hearing that the legal boundaries regarding the sale or offer to sell of a patented method is murky.  (ECF No. 281 at 80:14–17).  Nevertheless, because neither Party briefed this issue in any detail, the Court declines to reach it.

The Court also notes that its holding does not preclude Plaintiff from arguing Defendant's acts are infringing under other provisions of 35 U.S.C. § 271.  For example, Defendant did not respond to Plaintiff's argument that Defendant's offer of sale and sale of E+ components would be encompassed by 35 U.S.C. § 271(g).  (*See* ECF No. 221 at 18–19).  Indeed, at the hearing, Defendant's counsel conceded that the selling of a product made by a patented method falls within the scope of § 271(g).  (ECF No. 281 at 27:22–23).

36

"A district court should approach a motion for summary judgment on the fact issue of infringement with great care." *Amhil Enters. v. Wawa, Inc.*, 81 F.3d 1554, 1557 (Fed. Cir. 1996). "Summary judgment on the issue of infringement is proper when no reasonable jury could find that every limitation recited in a properly construed claim either is or is not found in the accused [method] either literally or under the doctrine of equivalents." *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1364 (Fed. Cir. 2005).

a. The '347, '710, '817 and '028 Patents

In its infringement analysis, the Court first turns to the Parties' dispute with respect to the '347, '710, '817 and '028 Patents. Here, the Parties' disagreement is largely one of claim scope. There is no genuine factual disputes as to Defendant's manufacturing method. (ECF No. 281 at 16:6–12; 22:18–25). As stated above, Defendant's method involves the fabrication of sheets of UHMWPE mixed with Vitamin E that are cut into bars. (ECF No. 224-5 at 10–11). These bars are then irradiated before being further processed into a final form. *Id.*

Defendant contends no reasonable jury could contend the polyethylene bars being irradiated are "medical implants"—which the Court previously construed as "component(s) manufactured for implantation in a patient's body." (ECF No. 224 at 15). As such, Defendant contends its manufacturing method does not infringe because the Asserted Patents require irradiation to be performed on a "medical implant." *Id.*

In contrast, Plaintiff contends Defendant's argument is inconsistent with the Court's claim construction, which does not require a "medical implant" to be in its "final form," and that Defendant has provided no evidence the polyethylene bars being irradiated are not "in-process medical components." (ECF Nos. 221 at 17–18; 232 at 9–10).

The Court is mindful that "[w]hen the parties raise an actual dispute regarding the proper scope of [claim terms], the court, not the jury, must resolve that dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008).

37

On the other hand, "'a sound claim construction need not always purge every shred of ambiguity,' including potential ambiguity arising from 'the words a court uses to construe a claim term'" as "'[s]uch an endeavor could proceed *ad infinitum*.'" *Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*, 853 F.3d 1370, 1379 (Fed. Cir. 2017) (quoting *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1318 (Fed. Cir. 2016)).

Here, the crux of Defendant's non-infringement position is a "medical implant" "must be capable of 'implantation into a patient's body.'" (ECF No. 248 at 10). This argument however, flies directly in the face of the Court's prior claim construction. In its prior Order, the Court rejected Defendant's argument that a "medical implant" should be construed as "a component that has been direct molded or machined *into its final shape* for implantation into a patient's body." (ECF No. 70 at 12 (emphasis added)).

On this issue of "finality," the Court found the following:

> Regarding whether the term is limited to finished articles in their final shape, neither the specification nor the prosecution history shows the patentee engaged in lexicography or clearly and unmistakably disavowed the term's full scope of its ordinary and customary meaning. For example, while Defendants point out language in the specification regarding "finished articles" and "finished implants," this does not support a finding that "medical implants" should be construed as "finished" as well.

(ECF No. 70 at 13). Simply put, the Court's point was that a "medical implant" need not be a "finished product." As Plaintiff correctly notes, Defendant's argument that a "medical implant" needs to be capable of being directly implanted into a patient's body is synonymous with its prior argument that a "medical implant" needs to be in its final form—an argument the Court already rejected.

This is not to say that a polyethylene bar mixed with Vitamin E clearly meets the definition of a "medical implant" as a matter of law. Whether such a material falls within or outside of the Court's construction is a matter for the jury.

38

As the Federal Circuit has explained:

> Claims are often drafted using terminology that is not as precise or specific as it might be. As long as the result complies with the statutory requirement to "particularly point[] out and distinctly claim[] the subject matter which the applicant regards as his invention," 35 U.S.C. § 112, para. 2, that practice is permissible. *That does not mean, however, that a court, under the rubric of claim construction, may give a claim whatever additional precision or specificity is necessary to facilitate a comparison between the claim and the accused product.* Rather, after the court has defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact.

*PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998) (emphasis added). In this case, the Court already construed "medical implant" with the "specificity and precision . . . warranted by the language of the claim and the evidence bearing on the proper construction." *Id.* That there is "some inherent imprecision resulting from the use of the term" is a "necessary consequence of treating infringement as a question of fact," not an indication that the Court need further construe its own construction. *Id.*

For these reasons, the Court is not persuaded that it must broaden or narrow its construction of a "medical implant" in order to facilitate summary judgment. *See GPNE Corp. v. Apple Inc.*, 108 F. Supp. 3d 839, 853 (N.D. Cal. 2015) (declining to further construe the term "node"); *EOS GmbH Electro Optical Sys. v. DTM Corp.*, No. SACV 00-1230 DOC (MLGx), 2004 U.S. Dist. LEXIS 32416, at *55 (C.D. Cal. Jan. 12, 2004) (declining to further construe term "medium capable of solidification").

Because the Court finds there is a genuine issue of material fact with respect to literal infringement, the Court need not reach the Parties' doctrine of equivalents argument. *Genes Indus. v. Custom Blinds & Components*, No. SACV 15-0476-AG(Ex), 2016 U.S. Dist. LEXIS 203620, at *18 (C.D. Cal. Sept. 26, 2016) ("Because there is a

///

triable issue of fact on literal infringement, the Court need not reach the issue on doctrine of equivalents.").

For these reasons, the Court **DENIES** Plaintiff's Motion for Partial Summary Judgment of infringement with respect to Claim 1 of the '347 Patent and **DENIES** Defendant's Motion for Summary Judgment of non-infringement with respect to the '710, '347, '817 and '028 Patents;

        b.    The '025 Patent

        i.    <u>Claim 1 of the '025 Patent</u>

Independent Claim 1 of the '025 Patent recites:

> A method for producing a wear-resistant and oxidation-resistant medical implant for a joint prosthesis comprising:
>
> providing an oxidation-resistant orthopaedic material comprising a polyethylene;
>
> forming the orthopaedic material into an implant for the joint prosthesis;
>
> packaging the orthopaedic material after being formed into the implant;
>
> sterilizing the orthopaedic material while packaged; and
>
> irradiating the orthopaedic material during the method at a total radiation dose of above 5 Mrad to about 25 Mrad so as to crosslink the orthopaedic material, thereby improving its wear resistance, without thermally treating the orthopaedic material to extinguish free radicals in the orthopaedic material during or subsequent to irradiating the orthopaedic material, wherein the orthopaedic material contains an antioxidant rendering it resistant to oxidation caused by free radicals generated by the irradiation.

Here, the Parties' dispute is essentially one of timing: specifically, the Parties disagree as to whether irradiation must occur *after* the orthopaedic material is formed into an implant. (ECF Nos. 221 at 7; 224 at 18–19).

Generally, whether the steps recited in a method claim must be performed in a particular order is properly a part of claim construction as a question of law. *Mformation Techs., Inc. v. Research in Motion Ltd.*, 764 F.3d 1392, 1398–400 (Fed. Cir. 2014).[8] Although the Court notes the Parties should have raised this dispute during claim construction, the Court nevertheless "retains discretion to hear belated claim construction arguments." *Bos. Sci. Corp. v. Johnson & Johnson*, 534 F. Supp. 2d 1062, 1074 (N.D. Cal. 2007). Given that the order of steps dispute is a question of law, and adjudicating this dispute serves the interests of judicial economy, the Court will consider the Parties' arguments.

"Unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one." *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001). "However, such a result can ensue when the method steps implicitly require that they be performed in the order written." *Id.*

In *Interactive Gift*, the Federal Circuit set out "a two-part test for determining if the steps of a method claim that do not otherwise recite an order, must nonetheless be performed in [a certain order]." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003) (citing *Interactive Gift*, 256 F.3d at 1342–43). The first part of that test requires the Court to "look to the claim language to determine if, as a matter of logic or grammar, [the steps] must be performed in [a certain order]." *Id.* If not, the Court must then "look to the rest of the specification to determine whether it directly or implicitly requires such a narrow construction." *Id.* at 1370 (quotations omitted).

In this case, nothing in the intrinsic evidence indicates that the "irradiation" step must be performed *after* the orthopaedic material is formed into a medical implant. First, Claim 1 does not grammatically nor logically indicate that the "irradiation" step must

---

[8] Indeed, at the hearing, Defendant's counsel agreed it was requesting that the Court further construe this claim to add an "order of steps" requirement. (ECF No. 281 at 80:20–81:10).

occur only *after* the orthopaedic material is formed into the implant.  To the contrary, the claim language recites that irradiation of the orthopaedic material occurs "*during* the method[.]"  '025 Patent, Claim 1.

Looking next to the written description, Defendant makes much of the specification's description that:

> Thus *the present invention* provides for a wear-resistant and oxidation-resistant implant by fabricating the implant from an oxidation-resistant polyethylene, including either shaping (such as machining) it from a preformed polyethylene, or by direct molding; packaging said implant, preferably in a low-oxygen atmosphere, and *subjecting the packaged implant to a radiation dose above the range used for conventional sterilization* in order to increase the level of crosslinking and, thereby, improve the wear resistance above that obtained with conventional radiation sterilization.

'025 Patent, col. 7:14–23 (emphasis added).

Defendant argues the specification's use of the phrase "the present invention" "expressly relates to the invention as a whole."  (ECF No. 235 at 10).  The use of this term "present invention" however is not so automatically limiting.  Instead, "while clear language characterizing 'the present invention' may limit the ordinary meaning of claim terms, such language must be read in context of the entire specification and the prosecution history."  *Rambus Inc. v. Infineon Techs. AG*, 318 F.3d 1081, 1094 (Fed. Cir. 2003).[9]

Here, the quoted passage does not suggest irradiating orthopaedic material *before* it is formed into an implant is an essential component of the invention.  Defendant does not point to anything in this passage, or elsewhere in the specification, that states this order is important or disclaims any other order of steps.  *Liebel-Flarsheim Co. v. Medrad, Inc.*,

_____

[9] The Court notes it already similarly rejected Defendant's contentions on the limiting force of the term "present invention" when construing the "sterilizing" and "medical implant" limitations, where Defendant had not shown there was an "unmistakable disclaimer" of claim scope.  (*See* ECF No. 70 at 7–15).

358 F.3d 898, 908–09 (Fed. Cir. 2004) (finding the language "principles of the present invention" did not limit the invention absent a clear disclaimer of subject matter).

Defendant's proposed construction would further violate the doctrine of claim differentiation by rendering claim 15 superfluous.  Claim 15 recites:

> 15. The method of claim 1 wherein all of the radiation dose is delivered before the orthopaedic material is formed into an implant.

While the doctrine of claim differentiation "is not a hard and fast rule of construction, it does create a presumption that each claim in a patent has a different scope." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998).  In this case, to interpret claim 1 as *requiring* irradiation to be performed before the orthopaedic material is formed into an implant would essentially render claim 15 superfluous.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.").

In support of its position, Defendant points to various extrinsic evidence, including Dr. McKellop's prior deposition testimony and Dr. Noble's expert report in a separate lawsuit.  (ECF No. 224 at 20–21).  Extrinsic evidence, however, is less reliable and significant than intrinsic evidence in ascertaining claim scope.  *See Phillips*, 415 F.3d at 1319 ("[E]xtrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence.").

Further, the Court does not find Defendant's citation to this extrinsic evidence persuasive.  The Court further does not read Dr. McKellop's testimony as confirming the '025 Patent requires irradiation to be performed in a certain order.  (ECF No. 224-9 at 94:24–95:15).  Defendant's citation to Dr. Noble's expert report is equally unpersuasive.  Specifically, Defendant points to Dr. Noble's statements regarding a simplified manufacturing process "allow[ing] for a single sterilization and crosslinking dose in the

finalized implant" that is "directly tied" to the '025 Patent.  (ECF No. 224-8 at 15).  The fact that the '025 Patent may *allow* for a benefit, however, does not mean it is *limited* to the recited benefit in claim scope.  "[N]ot every benefit flowing from an invention is a claim limitation."  *I4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 843 (Fed. Cir. 2010).

For these reasons, the Court **GRANTS** Plaintiff's Motion for Summary Judgment with respect to infringement of Claim 1 of the '025 Patent.

The Court notes that its holding, however, is a narrow one.  In this case, the Court has already held there are triable issues with respect to the *validity* of the '025 Patent.  These issues are very much alive, and must be resolved by the jury.  Ultimately, the jury's resolution of these issues may preclude Defendant from being held liable for infringement.

The Court may however decide the question of patent infringement separately from Defendant's *liability* for such infringement.  *See Commil USA, LLC v. Cisco Sys.*, 575 U.S. 632, 644 (2015) ("[I]nvalidity is not a defense to infringement, it is a defense to liability."); *Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1583 (Fed. Cir. 1983) ("Though an invalid claim cannot give rise to liability for infringement, whether it is infringed is an entirely separate question capable of determination without regard to its validity."); *Taser Int'l, Inc. v. Stinger Sys.*, 705 F. Supp. 2d 1115, 1154 (D. Ariz. 2010) ("Courts routinely enter summary judgment concerning infringement, saving questions of validity for trial."); *Al-Site Corp. v. Opti-Ray, Inc.*, No. CV-91-1770, 1992 U.S. Dist. LEXIS 13470, at *6 (E.D.N.Y. May 26, 1992) ("[A] court in a patent action may grant summary judgment on the question of infringement yet reserve other issues—such as validity of the patent or damages—for trial.").

### ii.   Claim 2 of the '025 Patent

Claim 2 of the '025 Patent recites:

> The method of claim 1, wherein the irradiated orthopaedic material possesses a degree of swelling of between about 1.7 to about 3.6.

44

In the Court's prior claim construction, it construed the limitation "degree of swelling" as the "weight ratio of swollen gel to dry gel." (ECF No. 70 at 18). The Court agreed with Plaintiff that a person of ordinary skill in the art would have used a weight-based approach to measure the degree of swelling and declined Defendant's invitation to assign specific parameters to this testing method based on a single example disclosed in the patent specification. *Id.* at 15–17.

The Parties' briefs focus on their respective experts and the tests performed to show that this limitation is (or is not) met. (ECF Nos. 221 at 12–14; 235 at 10–13). Plaintiff relies on tests conducted by Jordi Labs, which Plaintiff asserts calculated the division of the swollen mass by the dry mass, following what the Parties refer to as the "Shen" protocol. (ECF Nos. 221 at 13–14; 221-41). Defendant relies on tests conducted by Cambridge Polymer Group, which Defendant contends followed a weight-based testing method standardized by the American Society for Testing and Materials, known as ATSM D2765. (ECF No. 235 at 12). Both sides point to alleged flaws in the assumptions and testing methodologies used by the other to determine whether this limitation is met. (*See* ECF Nos. 221 at 13–14; 235 at 11–13).

The Parties' arguments presents a classic "battle of the experts," with both Parties and their experts claiming, with equal certainty, that this limitation is (or is not) met. "Where there is a material dispute as to the credibility and weight that should be afforded to conflicting expert reports, summary judgment is usually inappropriate." *Crown Packaging Tech., Inc. v. Ball Metal Bev. Container Corp.*, 635 F.3d 1373, 1384 (Fed. Cir. 2011). Here, the issue of whether Claim 2's limitation is met is best left to resolution before a finder of fact. *See Abbott Labs. V. Torpharm, Inc.*, 300 F.3d 1367, 1376–77 (Fed. Cir. 2002) (affirming denial of summary judgment where there remained genuine issues of disputed facts regarding whether "molecular weight measurements" demonstrated a patent limitation was met).

///

///

45

For these reasons, the Court **DENIES** the Parties' Motions for Summary Judgment with respect to infringement of Claim 2 of the '025 Patent.[10]

### 3.    Pre-Suit Willfulness, Pre-Suit Inducement

Defendant contends that Plaintiff cannot establish pre-suit willful infringement or pre-suit inducement infringement because there is no genuine issue of fact that Defendant did not have knowledge of the Asserted Patents before the lawsuit was filed.  (ECF No. 224 at 22–24).

### a.    Willfulness

Section 284 of the Patent Act provides that in a case of infringement, courts "may increase the damages up to three times the amount found or assessed."  35 U.S.C. § 284. The United States Supreme Court has stated "there is no precise rule or formula for awarding damages under §284[.]"  *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93 (2016) (quotations omitted).  Instead, "district courts are to be guided by [the] sound legal principles developed over nearly two centuries of application and interpretation of the Patent Act."  *Id.* (quotations omitted).  In applying these principles, district courts should "limit[] the award of enhanced damages to egregious cases of misconduct beyond typical infringement."  *Id.*   "The sort of conduct warranting enhanced damages has been variously described . . . as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate."  *Id.*

///

---

[10] Although Defendant moved for summary judgment of non-infringement of all of the Asserted Claims of the '025 Patent, its briefing focuses only on independent Claim 1. (ECF No. 224 at 18–21).  Defendant, therefore, has not met its "initial responsibility of identifying the legal basis of its motion, and of pointing to those portions of the record that it believes demonstrate the absence of a genuine issue of material fact" with regards to the remaining dependent claims of the '025 Patent.  *Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1046 (Fed. Cir. 2001).

For these reasons, the Court **DENIES** Defendant's Motion for Summary Judgment of non-infringement with respect to the remaining Asserted Claims of the '025 Patent.

19-CV-970 JLS (AHG)

Willfulness turns on the subjective intent of the alleged infringer. *Id.* ("A patent infringer's subjective willfulness of a patent infringer, intentional or knowing, may warrant enhanced damages, without regard to whether his infringement was objectively reckless."). As the Federal Circuit has held post-*Halo*, "[k]nowledge of the patent alleged to be willfully infringed continues to be a prerequisite to enhanced damages." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016). "[T]he factual components of the willfulness question should be resolved by the jury." *Id.*

"Post-*Halo*, courts have recognized that allegations of willful blindness can satisfy the knowledge requirement for willful infringement." *Corephotonics, Ltd. v. Apple, Inc.*, No. 17-CV-06457-LHK, 2018 U.S. Dist. LEXIS 170408, at *25–26 (N.D. Cal. Oct. 1, 2018). "Willful blindness is a high standard, requiring that the alleged inducer (1) subjectively believe that there is a high probability that a fact exists and (2) take deliberate actions to avoid learning of that fact." *Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365, 1373 (Fed. Cir. 2015).

### b. Inducement

Under § 271(b) of the Patent Act, "[w]hoever actively induces infringement of a patent shall be liable as an infringer." 35 U.S.C. § 271(b). "To prove inducement of infringement, the patentee must show that the accused inducer took an affirmative act to encourage infringement with the knowledge that the induced acts constitute patent infringement." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1332 (Fed. Cir. 2016) (quotations omitted). "The inducement knowledge requirement may be satisfied by a showing of actual knowledge or willful blindness." *Info-Hold, Inc.*, 783 F.3d at 1372.

### c. Analysis

Plaintiff contends there are numerous ways that a jury could find actual knowledge or willful blindness to support a claim for pre-suit willful or induced infringement. (ECF No. 232 at 17–18). First, Plaintiff contends Defendant's "principal researcher," John Vinciguerra, had knowledge of the applications that yielded the Asserted Patents, prior to

47

Defendant ever launching its own products. *Id.* at 17–18. Second, Plaintiff points to Mr. Vinciguerra's deposition transcript, where Mr. Vinciguerra testified regarding discussions that Defendant had regarding Plaintiff's patent applications. *Id.* at 18.[11]

In this case, Plaintiff's allegations that Defendant had pre-suit knowledge of the *patent applications* that eventually resulted in the Asserted Patents are insufficient to support its claims for willful or induced infringement. As district courts in the Ninth Circuit have found, "knowledge of a patent application alone is insufficient to meet the knowledge requirement for either a willful or induced infringement claim." *NetFuel, Inc. v. Cisco Sys. Inc.*, No. 5:18-cv-02352-EJD, 2018 U.S. Dist. LEXIS 159412, at *5 (N.D. Cal. Sept. 18, 2018); *see also, e.g.*, *Corephotonics*, 2018 U.S. Dist. LEXIS 170408, at *23 ("[I]t has been well-established both before and after the *Halo* decision that knowledge of a pending patent application does not confer knowledge of an existing patent."); *Adidas Am., Inc. v. Skechers USA, Inc.*, No. 3:16-cv-1400-SI, 2017 U.S. Dist. LEXIS 89752, at *8–9 (D. Or. June 12, 2017) ("[A]n infringer's knowledge of the patent application cannot, standing alone, constitute knowledge of the resulting, or issued, patent-in-suit.").

This is because "[f]iling an application is no guarantee any patent will issue and a very substantial percentage of applications never result in patents. What the scope of claims in patents that do issue will be is something totally unforeseeable." *State Indus. v. A.O. Smith Corp.*, 751 F.2d 1226, 1236 (Fed. Cir. 1985). Although Plaintiff contends a jury could still conclude Defendant was "willfully blind" to the Asserted Patents, "the law is clear that knowledge of a patent application does not suffice to show willful blindness." *Boundaries Sols. Inc. v. Corelogic, Inc.*, No. 5:14-cv-00761-PSG, 2014 U.S. Dist. LEXIS 178454, at *6 (N.D. Cal. Dec. 30, 2014); *see also NetFuel, Inc. v. Cisco Sys.*

---

[11] Defendant also contends Dr. McKellop stated in a declaration included in the prosecution history of the '718 Patent that Defendant had brought to market a product practicing the claimed invention. (ECF No. 232 at 18). It is not clear to the Court, however, how this is relevant.

*Inc.*, No. 5:18-cv-02352-EJD, 2018 U.S. Dist. LEXIS 159412, at *9 (N.D. Cal. Sept. 18, 2018) ("[T]he Federal Circuit has never placed an affirmative duty on defendants to keep tabs on the progress of pending applications.").[12]

Even if it were, the evidence Plaintiff cites does not suggest that Defendant had notice of Plaintiff's patent applications and then took affirmative steps to avoid learning of the Asserted Patents in light of that information.

As the Supreme Court has explained:

> [A] willfully blind defendant is one who takes *deliberate actions* to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts. By contrast, a reckless defendant is one who merely knows of a substantial and unjustified risk of such wrongdoing, and a negligent defendant is one who should have known of a similar risk but, in fact, did not[.]

*Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769–70 (2011) (emphasis added) (internal citations omitted).   Here, Mr. Vinciguerra's deposition testimony merely provides that Defendant knew about the patent applications and came to the conclusion that they were not valid and would likely not issue.  (*See* ECF No. 232-8 at 210:18–24; 213:12–19).   There is no evidence Defendant took any "deliberate steps" to avoid

///

///

---

[12] At the hearing, Plaintiff's counsel pointed to the Federal Circuit's decisions in *SRI Int'l, Inc. v. Cisco Sys.*, Nos. 2020-1685, 2020-1704, 2021 U.S. App. LEXIS 29277, at *12 (Fed. Cir. Sept. 28, 2021) and *WCM Industries, Inc. v. IPS Corp.*, 721 Fed. App'x 959 (Fed. Cir. 2018) as legal authority for the proposition that pre-suit knowledge of a patent application is sufficient to establish pre-suit willful or induced infringement.  (ECF No. 281 at 19:18-20:7).   The court is not persuaded.  The *SRI* case did not address pre-suit knowledge of a patent application.  And although the Federal Circuit questioned in *WCM* whether knowledge of a pending patent application can by itself support a finding of willfulness, it did not ultimately reach this issue.  *WCM*, 721 F. App'x at 974.

learning of infringement.[13]    Plaintiff's evidence reveals, at best, a risk of future infringement allegations Defendant might have had reason to explore.

For these reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment with respect to pre-suit willful and induced infringement.

## IV.    Defendant's Motion for Summary Judgment on Damages

Defendant moves for summary judgment that Plaintiff is not entitled to pre-suit damages under 35 U.S.C. § 271(g) or pre-issuance damages under 35 U.S.C. § 154(d). (ECF Nos. 224 at 24–25).  For the reasons set forth, the Court **DENIES** Defendant's motion for summary judgment with respect to pre-suit and pre-issuance damages.

### A.    Pre-Suit Damages

Defendant challenges the availability of pre-suit damages under 35 U.S.C. § 271(g) (importation of a product-by-process).  (ECF No. 224 at 22–24).  Defendant's argument derives from 35 U.S.C. § 287(b)(2)'s "safe harbor" provision, which provides that remedies for infringement under 35 U.S.C. § 271(g) are unavailable "with respect to any product in the possession of, or in transit to, the person subject to liability under such section before that person had notice of infringement with respect to that product."  35 U.S.C. § 287(b)(2).

Section 287(b)(2)'s "safe harbor" provision is not available, however, to any person who: (1) "practiced the patented process" (35 U.S.C. § 287(b)(1)(A)); (2) "owns or controls, or is owned or controlled by, the person who practiced the patented process" (35 U.S.C. § 287(b)(1)(B)); or (3) "had knowledge before the infringement that a ///

---

[13] At the hearing, Plaintiff's counsel pointed to various other witnesses that purportedly provided "conflicting testimony" regarding what deliberate actions Defendant took.  This testimony is not specifically identified in Plaintiff's briefing, and the Court declines to scour the record in search of it.  *See Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (holding that it is not the district court's role "to scour the record in search of a genuine issue of triable fact").

patented process was used to make the product the importation, use, offer for sale, or sale of which constitutes the infringement" (35 U.S.C. § 287(b)(1)(C)).

In Opposition, Plaintiff argues that Defendant has repeatedly insisted it is responsible for manufacture of the Accused Products and is liable for pre-suit damages under at least 35 U.S.C. § 287(b)(1)(B). (ECF No. 232 at 16). Defendant, in turn, asserts it does not fall into this exception because: (1) it does not own Orthoplastics; and (2) Plaintiff has not shown Defendant "control[s]" Orthoplastics. (ECF No. 224 at 24).

There is no genuine dispute in that case that Defendant does not "own" Orthoplastics. The question before the Court is whether Plaintiff has provided sufficient facts that a reasonable jury could find Defendant "controlled" Orthoplastics under 35 U.S.C. § 287(b)(1)(B).

Defendant argues that Plaintiff has not shown Defendant had the ability to "establish the manner and timing" of Orthoplastics' performance of the patented method, citing to the *Icon Laser Solutions, LLC v. Abercrombie & Fitch, Co*., No. 3:15-CV-03308, 2016 U.S. Dist. LEXIS 178347 (N.D. Tex. July 13, 2016) decision, which referenced the Federal Circuit's "direction and control" standard in *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020 (Fed. Cir. 2015). (ECF No. 224 at 24).

The Court is not convinced that Defendant is entitled to summary judgment on this issue. As an initial matter, the Court notes that the *Icon Laser* Court did not conclusively hold that the "direction and control" line of cases provides the correct standard for determining whether a defendant "controls" the "person who practiced the patented process" under 35 U.S.C. § 287(b)(1)(B).

Instead, in *Icon Laser*, the plaintiff and defendant presented differing views on what was required to show "control." The defendant advocated for the "direction and control" standard. *Icon Laser*, 2016 U.S. Dist. LEXIS 178347, at *6–7. The plaintiff advocated for a less stringent standard and contended there was a "distinction between controlling how a third party performs every step of the patented method and simply

51

19-CV-970 JLS (AHG)

controlling the entity that is performing those steps[.]" *Id.* at 7. Rather than make a determination of which of these was the correct standard, the *Icon Laser* court held it was unnecessary to resolve this dispute because the plaintiff fell short under either standard. *Id.* at 8.[14]

Even assuming that the Federal Circuit's "direction and control" line of cases provides the correct standard however, the Court is not convinced that Defendant is entitled to summary judgment on this issue. In *Akamai*, the patent-at-issue covered methods for efficiently delivering web content and its claims required the performance of a number of steps including a "tagging" step that the parties agreed were performed by Limelight's customers—and not Limelight. *Akamai Techs., Inc.*, 797 F.3d at 1024–25. The court found Limelight had established the "manner and timing" of its customers' performance by providing them with detailed instructions telling them how to complete these steps and resources in case the customer experiences problems. *Id.* at 1025.

The *Akamai* court held:

> In sum, Limelight's customers do not merely take Limelight's guidance and act independently on their own. Rather, Limelight establishes the manner and timing of its customers' performance so that customers can only avail themselves of the service upon their performance of the method steps.

*Id.* Here, Defendant does not dispute that it provides material specifications for the manufacture of the Accused Products. (ECF No. 247 ¶ 35). Plaintiff also submitted

---

[14] Plaintiff's counsel contended at the hearing that the *Icon Laser* decision is analogous to the instant case. (ECF No. 281 at 30:9-14). The Court disagrees. Indeed, the factual circumstances underlying the *Icon Laser* decision are easily distinguishable from the instant case. In *Icon Laser*, the question was whether *social responsibility policies* various defendants issued to manufacturers were sufficient to show control. 2016 U.S. Dist. LEXIS 178347, at *8. These policies addressed "child labor, forced labor, fair wages, safe working environments, discrimination, and similar issues." *Id.* at *9. As the *Icon Laser* court itself noted, these policies did not apply to "the method of manufacturing." *Id.*

evidence on the record that: (1) Defendant is responsible for the contents of these specifications; and (2) Defendant requires its third-party suppliers to adhere to these specifications.  (ECF Nos. 247 ¶ 35; 232-6 at 77:17–78:6).

In light of Plaintiff's evidence, a reasonable jury could find that Defendant controls Orthoplastics' actions by issuing these specifications and requiring Orthoplastics to adhere to them.  Summary judgment on these grounds is therefore improper.  *See Samsung Elecs. Co. v. NVIDIA Corp.*, 160 F. Supp. 3d 866, 879 (E.D. Va. 2015) (summary judgment on § 287(b) "safe harbor" provision improper where plaintiff had pled facts sufficient to raise a material dispute about defendant's control of a third-party manufacturing company).

For these reasons, Defendant's Motion for Summary Judgment on the availability of pre-suit damages is **DENIED.**

### B.    Pre-Issuance Damages

Defendant contends that Plaintiff is not entitled to any damages prior to the issuance of the '347 Patent.  (ECF No. 224 at 24–25).  A patentee may generally only recover damages for infringement occurring after a patent is issued.  However, under 35 U.S.C. § 154(d), a patentee can obtain a "reasonable royalty" for activities amounting to infringement of a patent application's claims if: "(1) the issued patent claims are substantially identical to the claims in the published application; and (2) [defendant] had actual notice of the published patent application."  *Stephens v. Tech Int'l, Inc.*, 393 F.3d 1269, 1275 (Fed. Cir. 2004).

Here, the Parties dispute whether the '347 Patent is "substantially identical" to U.S. Patent Publication No. 2003/0212161 ("'161 Publication"), such that Plaintiff would be entitled to pre-issuance damages.  (ECF Nos. 224 at 25; 232 at 21–22).  In ascertaining what it means for a published application to be "substantially identical" to an issued the patent, the Federal Circuit (albeit in an unpublished opinion) has recently applied the same interpretation of "substantially identical" in the § 154(d) context as it has applied to determine whether reissued claims are "substantially identical" to original claims under

35 U.S.C. § 252. *See Innovention Toys, LLC v. MGA Entm't, Inc.*, 611 F. App'x 693, 699 (Fed. Cir. 2015).

Under this standard, claims are "identical" if they are "without substantive change." *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1346 (Fed. Cir. 1998). "[I]n determining whether substantive changes have been made, [the court] must discern whether the *scope* of the claims are identical, not merely whether different words are used." *Id.* (emphasis in original). Whether the patent and published application are substantially identical is a question of law. *Id.*

Defendant invites the Court to compare the language of Claims 1 and 6 of the '347 Patent to Claims 16 and 17 of the '161 Patent Application. A side-by-side comparison of claim language is set forth in the table below:

| '347 PATENT | '161 PATENT APPLICATION |
| --- | --- |
| 1. A method for producing a wear-resistant and oxidation-resistant medical implant of a joint prosthesis, said method comprising the steps of:<br><br>(I) providing an oxidation-resistant medical implant of a joint prosthesis comprising a polyethylene component; and<br><br>(II) irradiating the oxidation-resistant medical implant at a radiation dose of above 5 Mrad to about 25 Mrad so as to crosslink the implant thereby improving its wear resistance, without thermally treating the implant to extinguish free radicals in the irradiated and crosslinked implant during or subsequent to irradiating the oxidation-resistant implant; wherein the oxidation-resistant implant contains an antioxidant rendering it resistant to | 16. A method to improve the wear resistance of an orthopaedic material comprising a polyethylene, the method comprising the steps of:<br><br>(a) providing an oxidation-resistant polyethylene;<br><br>(b) irradiating the oxidation-resistant polyethylene at a dose of from about 5 Mrad to 100 Mrad, without melting or annealing the irradiated polyethylene, wherein said oxidation-resistant polyethylene is more resistant to oxidation than a reference preformed UHMWPE, and wherein said radiation is by gamma radiation or electron beam radiation. |

19-CV-970 JLS (AHG)

| | |
|---|---|
| oxidation caused by free radicals generated by the irradiation of step (II). | |
| 6. The method of claim 1, wherein the irradiation is performed with radiation selected from the group consisting of: gamma radiation and electron beam radiation. | 17. The method of claim 16, wherein the radiation dose is from about 5 to about 25 Mrad. |

Defendant argues there are three substantive differences between Claims 1 and 6 of the '347 Patent to Claims 16 and 17 of the '161 Patent Application. First, Defendant argues Claim 1 of the '347 Patent is directed towards a method for producing a "wear-resistant and oxidation-resistant medical implant," while the '161 Patent Application is directed towards a method for improving the wear resistance of an "orthopaedic material." (ECF No. 224 at 25). Defendant contends the two claims do not result in the "same product." *Id.*

This argument is unpersuasive. As Plaintiff notes (ECF No. 232 at 21), Defendant's contentions are derived from the preamble of the claims. The Federal Circuit, however, "has recognized that as a general rule preamble language is not treated as limiting." *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1347 (Fed. Cir. 2012). Here, Defendant has provided no explanation for why the Court should deviate from this general rule. For example, the Court does not find that the "deletion of the disputed phrase[s] from the preamble[s] . . . [would] affect the structural definition or operation of the [invention] itself." *Catalina Mktg. Int'l v. Coolsavings.com, Inc.*, 289 F.3d 801, 810 (Fed. Cir. 2002). As the Federal Circuit has long held, "a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.'" *Arctic Cat Inc. v. GEP Power Prods.*, 919 F.3d 1320, 1328 (Fed. Cir. 2019) (quoting *Catalina*, 289 F.3d at 808).

///

55

Defendant argues secondly Claim 1 of the '347 Patent's limitation of "without thermally treating the implant" differs from Claim 16 of the '161 Patent Application's recitation of "without melting or annealing the irradiated polyethylene." (ECF No. 224 at 25). Specifically, Defendant asserts Claim 1 of the '347 Patent prohibits thermal treatment *during* irradiation, while Claim 16 of the '161 Patent Application prohibits thermal treatment *after* irradiation. *Id.*

This difference however, is not supported by the record. A plain reading of Claim 1 of the '347 Patent reveals it recites the lack of thermal treatment both "*during or subsequent to* irradiating the oxidation-resistant implant." Likewise, Claim 16 recites not melting or annealing "the irradiated polyethylene" without reference to whether this is *during* or *subsequent* to irradiation.

In addition, the bodies of the '347 Patent and '161 Patent Application also contain identical disclosures of how it is unnecessary to perform thermal treatment either "*during or after* radiation crosslinking*":

> In the present invention, since the polyethylene has been formed in a manner that renders it highly resistant to oxidation, despite the presence of free radicals, *there is no need to thermally treat the polyethylene during or after radiation crosslinking* (e.g., by annealing or remelting) in order to extinguish the residual free radicals, and thus simplifying the manufacturing process.

'347 Patent at col. 7:19–25; '161 Patent Application ¶ 35; *see Phillips*, 415 F.3d at 1315 (the patent specification "is the single best guide to the meaning of a disputed term.").

Finally, Defendant argues that Claim 1 of the '347 Patent recites that "the oxidation-resistant implant contains an antioxidant rendering it resistant to oxidation caused by free radicals generated by the irradiation" while Claim 16 of the '161 Patent Application recites an "oxidation-resistant polyethylene [that] is more resistant to oxidation than a reference preformed UHMWPE[.]" (ECF No. 224 at 25). Defendant provides no explanation for what the substantive difference in scope is here beyond simply reciting this language verbatim.

56

Similarly, in its Reply, Defendant argues in a conclusory fashion that the "extensive prosecution history" and "numerous claim amendments" the '347 Patent underwent "further illustrate the degree of difference" between the issued patent and published patent application.  (ECF No. 248 at 13).  The Court is not inclined to sift through the extensive record to find support for Defendant's arguments.  *Dzung Chu v. Oracle Corp. (In re Oracle Corp. Sec. Litig.)*, 627 F.3d 376, 386 (9th Cir. 2010) ("It behooves litigants, particularly in a case with a record of this magnitude, to resist the temptation to treat judges as if they were pigs sniffing for truffles.").

In this case, the Court will not grant summary judgment in Defendant's favor on the basis of conclusory arguments made by the moving party.  *See Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000) ("A moving party without the ultimate burden of persuasion at trial . . . has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment.").

For the above reasons, Defendant's Motion for Summary Judgment on pre-issuance damages is **DENIED.**

### CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** the Parties' respective Motions for Summary Judgment.  Specifically:

1.  The Court **GRANTS** Plaintiff's Motion of no anticipation with respect to the '347 and '025 Patents;

2.  The Court **DENIES** Plaintiff's Motion of non-obviousness with respect to the '347 and '025 Patents;

3.  The Court **DENIES** the Parties' Motions for summary judgment on the issue of enablement;

4.  The Court **GRANTS** Plaintiff's Motion for summary judgment of definiteness and adequate written description with respect to the '347 and '025 Patents;

5.  The Court **GRANTS** Defendant's Motion for Summary Judgment that Defendant is not liable for infringement under the "use" prong of § 271(a);

6.     The Court **GRANTS** Plaintiff's Motion for Partial Summary Judgment that Defendant infringes Claim 1 of the '025 Patent and **DENIES** Plaintiff's Motion that Defendant infringes Claim 2 of the '025 Patent or Claim 1 of the '347 Patent;

7.     The Court **DENIES** Defendant's Motion for Summary Judgment of non-infringement of the Asserted Patents;

8.     The Court **GRANTS** Defendant's Motion for Summary Judgment with respect to pre-suit willful and induced infringement;

9.     The Court **DENIES** Defendant's Motion for Summary Judgment on pre-suit and pre-issuance damages; and

10.    The Court **DENIES WITHOUT PREJUDICE** the Parties' respective *Daubert* motions subject to re-filing at a later date.

In light of the findings in this Order, the Parties shall file updated Memoranda of Contentions of Fact and Law.  The Parties are **DIRECTED** to contact the assigned Magistrate Judge within **<u>seven days</u>** of the issuance of this Order to reset the remaining pretrial deadlines in this case.

**IT IS SO ORDERED.**

Dated:  January 27, 2022

*Janis L. Sammartino*
Hon. Janis L. Sammartino
United States District Judge

19-CV-970 JLS (AHG)